Gila DWECK, Success Apparel LLC and Premium Apparel Brands LLC, Plaintiffs/Counterclaim Defendants,

v.

Albert NASSER and Kids International Corporation, Defendants/Counterclaim Plaintiffs,

and

Kevin Taxin and Bruce Fine, Third–Party Defendants.

C.A. No. 1353–VCL.

Court of Chancery of Delaware.

Submitted: June 13, 2008.
Decided: July 2, 2008.

Bruce L. Silverstein, Esquire, Martin S. Lessner, Esquire, Kathaleen McCormick, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; John H. Reichman, Esquire, Meagan A. Zapotocky, Esquire, Wachtel & Masyr, LLP, New York, New York, Attorneys for the Plaintiffs/Counterclaim Defendants, and Third–Party Defendants.

Samuel A. Nolen, Esquire, Catherine G. Dearlove, Esquire, Richard P. Rollo, Esquire, Seth Barrett Tillman, Esquire, Thomas A. Uebler, Esquire, Scott W. Perkins, Esquire, Richards Layton & Finger, P.A., Wilmington, Delaware, Attorneys for the Defendants/Third–Party Plaintiffs.

## *OPINION*

LAMB, Vice Chancellor.

A minority stockholder, and former president, chief executive officer, and director of a closely held corporation seeks to enforce a settlement agreement terminating the litigation between herself and the defendant, the majority stockholder. On November 19, 2007, a long-time attorney, business associate, and close personal friend of the defendant agreed to a settlement after protracted negotiations.

Even though the defendant instructed the attorney to "speak in his name" in the settlement negotiations and consented to the material terms, the defendant rejected the agreement and ultimately refused to sign. The defendant also rejected his attorney's authority to bind him to the agreement, since he was not the attorney of record in the case.

After a one-day hearing, it became clear that the defendant had granted his long-time attorney the requisite authority to enter into the settlement. Indeed, the defendant's attorney of record testified that the defendant had granted such authority and that he felt a binding settlement had

been reached. Thus, this court concludes that the parties reached a binding settlement agreement on November 19, 2007.

## I.

### A. *The Parties*

Plaintiff Gila Dweck formerly served as president, chief executive officer, and as a member of the board of directors of Kids International, Inc; the corporation at the center of the underlying dispute between the parties. Dweck is a 30% stockholder in Kids.[1] Defendant Alberto Nasser Missri ("Nasser") is a Spanish citizen who resides in Geneva, Switzerland. Nasser is the chairman of the board of directors of Kids and controls 52.5% of its equity. Defendant Kids is a Delaware corporation with its principal place of business in New York, New York.

### B. *Procedural History*

Dweck and others filed suit on May 18, 2005, against Nasser and others for various breaches of fiduciary and contractual duties, seeking, among other things, a declaratory judgment concerning their right to compete with Kids. In response, on June 14, the defendants filed an answer and counterclaims alleging that Dweck breached her fiduciary duties by wrongfully operating competing businesses out of the company's premises. On September 20, 2005, the defendants filed a motion for partial judgment on the pleadings. That motion was granted in part, enforcing Nasser's termination of Dweck's employment with Kids.[2]

Settlement discussions began in earnest in 2007 and the parties appeared to have reached an agreement on November 19, 2007. On February 15, 2008, following Nasser's refusal to sign the settlement document, the plaintiffs moved to enforce the settlement agreement and to stay proceedings. Following discovery limited to this issue, the court held a one-day hearing on May 22, 2008.

### C. *The Settlement Agreement*

Since this opinion considers the plaintiffs' motion to enforce the settlement agreement, no discussion of the merits of the underlying claims is necessary. Instead, the court will consider whether the defendants are bound to the settlement agreement purportedly reached on November 19, 2007, on the eve of Dweck's deposition.

The settlement agreement purports to settle "all claims and disputes among the parties,"[3] including the litigation filed in this court and a substantially similar action filed by the defendants in New York.[4] The agreement also provides for broad releases by Dweck, Nasser, and their affiliates.[5]

---

1. Success Apparel LLC and Premium Apparel Brands LLC are also plaintiffs in this action. These entities are owned by Dweck and are the corporations Nasser alleges improperly competed with Kids. Kevin Taxin and Bruce Fine are third-party defendants in this action and former employees of Kids.

2. *See Dweck v. Albert Nassar and Kids Int'l Corp.,* 2005 WL 3272363 (Del.Ch. Nov.23, 2005).

3. Section 8.1.1 requires the parties to deliver a "Stipulation dismissing the Litigation with

prejudice except as to the matters set forth in this Agreement and without costs, a copy of which is attached as Exhibit 8.1.1 hereto, executed and delivered by legal Counsel for each respective party thereto." JX 1 at 3744.

4. *See Kids Int'l Corp. v. Success Apparel LLC et al.,* (N.Y. Sup. Index No. 601937/05). The parties agreed to stay the New York action pending the entry of a final judgment in this court.

5. Section 8.1.2 requires the parties to deliver "Releases executed and delivered by the Nas-

The terms of the agreement require Dweck to pay 52.5% of the aggregate profits, from January 1, 2001 through May 18, 2005, generated by the entities that allegedly competed with Kids.[6] In addition, the settlement agreement provides for a $1.05 million payment from Dweck to Nasser as reimbursement for the litigation expenses he incurred in connection with the Kids dispute. Nasser, for his part, is to compensate Dweck for the value of her 30% equity interest in Kids, to be determined by an arbitrator. A supplemental agreement is attached to the settlement agreement, providing for an arbitrator to account for certain payments Kids made to offshore entities and distribute 30% of those payments, pursuant to a detailed formula, to Dweck.

## D. *History Of The Case*

The dispute between the parties surfaced in January 2005, when Nasser discovered that Dweck was allegedly operating competing businesses out of Kids' offices in New York. On March 11, 2005, Nasser removed Dweck as president of Kids and replaced her with his nephew, Itzhak Djemal. The parties discussed a settlement beginning in early 2005, but could not reach an agreement. Due to

this impasse, Dweck, on May 18, 2005, filed a complaint in this court challenging Nasser's termination of her employment at Kids. In response, Nasser promptly filed a motion to dismiss several counts of the complaint, including a claim that Nasser breached his fiduciary duties by replacing Dweck with his allegedly unqualified nephew.[7] On November 23, 2005, this court granted Nasser's motion, in part, upholding Nasser's termination of Dweck.[8]

Following that decision, activity in the litigation slowed considerably. Discovery was delayed after the defendants moved to file an amended answer, counterclaims, and third-party claims. Following the grant of that motion, progress was again slowed by the parties' inability to agree on a scheduling order. In fact, a proposed stipulated order was not entered until November 28, 2006, scheduling trial for November 2007. Then, on October 2, 2007, at the request of the parties, this court approved the rescheduling of trial for May 2008.

In early 2007, hoping to move discussions forward, Dweck retained William B. Wachtel to facilitate a settlement.[9] Although Nasser's attorney of record in the

ser Entities and Albert Nasser in his capacity as Trustee of the Trust dated March 30, 1993 f/b/o Alicia Elenca Nasser ... and [Kids] on the one hand and Dweck Parties, on the other hand, releasing any and all claims between such parties from the beginning of time through the date of this Settlement Agreement but excluding from such releases claims, liabilities and obligations arising out of or arising in connection with this Settlement Agreement which releases are attached as Exhibit 8.1.2(a) and 8.1.2(b) hereto...." JX 1 at 3744.

6. The settlement agreement charges a financial arbitrator with determining the amount of profits.

7. Oral argument on the motion was scheduled, but in the interim, the parties resumed settlement discussions and asked to delay the litigation. On September 16, 2005, Dweck filed an unsuccessful motion for a temporary restraining order seeking, among other things, to limit Nasser's ability to divert funds from Kids.

8. However, this court also held that the plaintiff sufficiently pled that Nasser "did not act in the best interest of the company when he replaced the plaintiff with his allegedly unfit nephew." *Dweck*, 2005 WL 2508607, at *1.

9. Wachtel is a partner in the New York office of Wachtel & Masyr, LLP. Wachtel Aff. ¶ 1.

litigation is Kurt Heyman,[10] Wachtel reached out to Amnon Shiboleth, Nasser's close friend, business associate, and primary attorney for over 20 years. Wachtel had known Shiboleth professionally for many years "most[ly] having to do with [Shiboleth's] representation of Nasser," and regarded Shiboleth as someone he felt he "could have a forthright conversation with."[11] Wachtel asked Shiboleth whether he would be interested in working together to reach a settlement between the parties. As Wachtel discovered, Shiboleth was exceedingly familiar with the underlying dispute because he had assisted in forging the original business agreement between the parties and had "continued to represent the entity" from time to time over the years.[12] Shiboleth had even attempted to settle the litigation at the outset of the dispute.[13]

After securing approval, Shiboleth agreed to work with Wachtel.[14] In order to advance the negotiations, Wachtel and Shiboleth created a joint memorandum in January 2007 "sharing with [both clients their] collective judgment as to how a settlement could be forged under the circumstances."[15] After reviewing it with their clients, they used the framework of this memo to prepare a draft settlement agreement.

Draft agreements were circulated among the parties during the spring of 2007. Nasser reviewed these agreements and instructed Heyman as to terms he objected to and considered non-negotiable. Specifically, Nasser felt that Dweck should be responsible for all the expenses and costs he incurred in the Kids dispute, that he would not compensate Dweck directly for her equity value in Kids, and he did not "want to be the one who wound up with the company at the end of the day."[16] Negotiations continued through the summer without significant progress due partly to these pre-conditions. In August 2007, however, Nasser changed his attitude and instructed Heyman that he wanted to reach a settlement and, thus, would relent, if necessary to resolve the dispute.[17] Heyman testified that after this August 2007 discussion he understood that Nasser no longer wanted to "interpose those issues as objections."[18] According to Heyman, Nasser told him that:

> [He] had been traveling a lot . . . that he was tired and he was feeling his age; and that his wife told him that he needed to slow down . . . [a]nd part of that was settling this matter and . . . he also didn't want to drag his . . . long-time business partner and lawyer and friend, Amnon Shiboleth, through the discovery . . . and that he no longer—which was contrary to things he said previously— no longer viewed it as his job to punish Ms. Dweck.[19]

Significantly, Nasser also told Heyman that he had directed Shiboleth "to get it

---

10. Heyman is a partner at Proctor Heyman LLP in Wilmington, Delaware.

11. Tr. 8.

12. *Id.*

13. Tr. 9–10.

14. While the circumstances of this initial approval are unclear, several months later, as will be discussed, Nasser directed Shiboleth to reach a settlement.

15. Tr. 10.

16. Tr. 99–100.

17. Heyman Dep. 9.

18. *Id.*

19. Tr. 101.

done," [20] which Heyman understood to mean settle the litigation.[21] Before this conversation, Heyman had spoken with Shiboleth who related a substantially similar conversation with Nasser and told Heyman that Nasser had directed him to settle the dispute.[22]

The settlement negotiations, reinvigorated by Nasser's instructions, continued. At Wachtel's request, in September 2007, an "intervention" was staged where Heyman described to Dweck the hurdles she faced in litigation.[23] At that meeting, Heyman presented Dweck with a settlement agreement approved by Nasser. Wachtel and Dweck's brother encouraged her to sign the agreement, but Dweck was opposed to the methodology for valuing Kids and the related entities.[24] Specifically, Dweck objected to valuing the entities "collectively" and felt that each business should be valued independently.[25] After Dweck's rejection, Nasser instructed Heyman that he was no longer going to negotiate, stating that he would only consider a settlement agreement that Dweck had already signed. Indeed, Nasser told Heyman not to further delay the proceedings "unless there's a final fully-executed settlement." [26]

Beginning in November, the parties increased their efforts to reach a resolution to avoid the looming discovery necessary for the scheduled trial. Discovery had been delayed and this court, in an order entered on October 2, directed the parties to begin discovery "as soon as practicable," starting with Dweck's deposition. Given this instruction and the parties' frustration with the slow pace of the litigation, they agreed that, in the absence of a "fully-executed" settlement agreement, Dweck's deposition would proceed on November 20. Dweck was extremely reluctant to testify at her deposition, which greatly contributed to her motivation to reach a settlement before that date.[27]

The settlement negotiations became intense and even "frantic" starting around November 13. Wachtel sent a proposed settlement agreement, signed by Dweck, on November 13,[28] but it included proposed terms that were not included in the previously circulated drafts that Nasser had reviewed. The salient proposed terms included a cap on certain damages Dweck might owe to Nasser depending on the outcome of an agreed upon arbitration. In addition, the draft included a provision permitting Dweck, in lieu of a monetary payment, to transfer to Kids the two allegedly competing companies.

Since Shiboleth was out of town, Heyman, after speaking with Nasser, responded to the draft on November 14, notifying Wachtel of Nasser's objection to the possible transfer to Kids and stating that Nasser was willing "to accept … a 'floor' of

20. *Id.*

21. Tr. 74.

22. Nasser denies that he used the term "get it done," but his testimony was inconsistent. Nasser Dep. 97. He testified that "[w]hat I meant is make the settlement and let me know. I will sign. I never authorized anybody in my life that will sign instead of me without my authority, and this is used all over the world. I don't know your laws here, and therefore, they may take it the way they want." *Id.* Nasser also testified that he could not remember exactly what he told Shiboleth or Heyman. *Id.* at 99–102.

23. Tr. 104.

24. JX 46.

25. *Id.*

26. Tr. 108–109.

27. Tr. 109.

28. JX 48.

$15 million and a 'cap' of $50 million."[29] Wachtel sent a second draft settlement agreement at 3:17 p.m. on November 16, eliminating the provision regarding any transfer to Kids and setting the cap at $40 million.[30] Like the other settlement drafts, this document was signed by Dweck.

Since November 16 was a Friday, settlement discussions did not resume until the morning of November 19. Dweck, eager to settle the dispute before her deposition, agreed to remove the cap provision and the transfer provision entirely.[31] Therefore, Wachtel sent Nasser an executed agreement at 11:37 a.m. with the cap provision removed, but otherwise substantially similar to the November 16 draft. Satisfied that all of Nasser's issues had been addressed, Heyman responded at 3:39 p.m. confirming the cancellation of Dweck's deposition and thanking Wachtel for his "perseverance."[32] As discussed below, Heyman was careful not to expressly agree to the settlement because he felt that authority was vested with Shiboleth. That afternoon, however, Shiboleth, who

had already secured Nasser's final consent to the agreement,[33] did notify Wachtel that the action was settled and that Nasser would promptly sign the agreement.[34] Wachtel sent the final settlement agreement at 5:24 p.m. for Nasser's signature.[35] At that time, Wachtel, Shiboleth, and Heyman believed that a final settlement had been reached between the parties.[36]

Nasser testified that he took a 7 p.m. plane back to Geneva on November 19 and did not see the final settlement agreement on that date. Heyman testified, however, that the following day Nasser told him that "Shiboleth's office was forwarding the materials to him for his signature" and that he would sign the agreement.[37] Instead of executing the agreement, Nasser sent Heyman an email on November 23 stating "there are things that I don't understand in the agreement, call me after the holiday to discuss...."[38]

On November 28, Nasser objected to several provisions, including the contemplated payment to Dweck, his continued interest in Kids, and the less than full

29. JX 50. Despite Heyman's more significant involvement in the negotiations at this point, he testified that Shiboleth was still the settlement attorney and "remained the point person." Heyman Dep. 27–28.

30. JX 57. The parties also resolved to have an arbitrator determine whether the companies should be valued collectively or independently. Tr. 106.

31. Tr. 18–19. As an aside, since Nasser is in business with some of Dweck's brothers and is familiar with her family, one of Dweck's brothers, Ezra Dabah, spoke with Nasser over the weekend and Nasser agreed to a floor and a cap on the damages. Tr. 21, 23. Dweck, however, agreed to drop the cap provision entirely before learning of Nasser's concession and the cap provision was removed from the final settlement agreement.

32. JX 59.

33. Tr. 7–8.

34. Shiboleth Dep. 8; Tr. 29.

35. The settlement agreement Wachtel sent earlier in the afternoon contained Dweck's signature, but not Kevin Taxin's, a third party to the underlying dispute. Heyman contacted Wachtel in order to have Taxin execute the agreement because Heyman "did not want to be in the position of the other side being able to get out of the agreement on the basis that Mr. Taxin had not signed it." Tr. 92. The final settlement agreement sent at 5:24 p.m. contained Taxin's signature.

36. Tr. 28–29, 36, 71–72; Shiboleth Dep. 6.

37. Tr. 72.

38. JX 68 (emphasis omitted).

restitution for his losses.[39] These are the same principal objections identified at the outset of the settlement negotiations, but relented on during the August 2007 conversation with Heyman. These provisions were also included in the earlier draft agreements Nasser had reviewed without objection.

Nasser also rejected Shiboleth's authority to enter into the settlement, telling Heyman "that it was never his intention to give up the right to review and approve the agreement just as Ms. Dweck had refused to sign before, he could refuse to sign now."[40] Heyman informed Nasser that he believed Shiboleth had been given the authority to enter into the settlement, but Nasser disagreed.[41]

Shortly after this conversation, Nasser memorialized his objections to the settlement agreement in an email he sent to Heyman and Shiboleth on December 3.[42] Shiboleth attempted to dissuade Nasser from refusing to sign the agreement.[43] While Shiboleth testified that Nasser's

email did identify a few legitimate problems in the agreement, he described them as minor errors that Wachtel would (and did) clearly agree to fix.[44]

Notwithstanding Nasser's balkiness, Shiboleth testified he believed Nasser would ultimately sign and that Nasser was prepared to do so in early January 2008.[45] According to Shiboleth, the only obstacles were procuring a power of attorney for Nasser's nephew to execute the agreement on Nasser's behalf,[46] and identifying the proper entity to execute the supplemental agreement.[47] Shiboleth's understanding changed, however, when Wachtel told him of a letter dated January 30, 2008 from Daniel Crosby,[48] an attorney retained by Nasser "to represent his interests in settlement negotiations between himself and ... Dweck."[49] The letter informed Wachtel that Nasser "reached the conclusion that neither his interests nor justice would be served by his signing the proposed Settlement Agreement."[50] At his deposition, Shiboleth stated that this letter was the first time he learned of Nasser's inten-

39. Tr. 129.

40. Tr. 130.

41. *Id.*

42. JX 74.

43. Tr. 131–32; Shiboleth Dep. 22.

44. Shiboleth Dep. 22.

45. *Id.* at 32, 96–97.

46. *Id.* at 32 ("If you ask me ... the time frame that [Nasser] wanted Djemal to sign [the settlement agreement] on his behalf whether he would still commit it, in my understanding to the settlement agreement the answer is clearly yes.").

47. Tr. 33; Shiboleth Dep. 33. Several of the misstatements identified by Nasser in his December 3 email were in the supplemental

agreement. The parties made the necessary revisions to the supplemental agreement in the beginning of December and planned to further revise the agreement in January. This second round of revisions was never completed, however, after the January 30, 2008 letter, as described below, was sent. Shiboleth Dep. 105–106. These additional revisions were only addressing minor errors and did not constitute any material changes in dispute among the parties. *Id.* Moreover, Shiboleth testified there was never any dispute as to what would be in the release or stipulation of dismissal. *Id.* at 110–11.

48. JX 89. Crosby is an attorney at the Switzerland-based law firm Budin & Partners, but he practices in New York, Massachusetts, and Washington, D.C.

49. *Id.*

50. *Id.*

tion not to sign the agreement.[51]

Offended by Nasser's conduct, Shiboleth sent him a strongly worded letter, dated February 18, 2008, expressing his disappointment with Nasser's retention of Crosby and his refusal to agree to the settlement. Shiboleth also reminded Nasser that he had authorization to settle the dispute and that Nasser independently agreed to the settlement on seven different occasions.[52]

## II.

The plaintiffs assert that both Heyman and Shiboleth independently agreed to the settlement, thus, binding Nasser to the final agreement executed on November 19. Specifically with respect to Heyman, Nasser's attorney of record, while he may have never expressly told Wachtel that he agreed to the settlement, he implicitly agreed. Heyman's conduct on November 19, including the cancellation or postponement of the Dweck deposition and the other discovery, according to the plaintiffs, supports a finding that an enforceable expression of acceptance occurred.

More forcefully, the plaintiffs claim that Nasser granted Shiboleth the authority necessary to enter into the settlement agreement on his behalf, and that Shiboleth expressly agreed to the settlement. First, even though Shiboleth was not Nasser's attorney of record, Nasser's long-standing relationship with Shiboleth warrants a presumption that his acceptance was binding. Alternatively, the plaintiffs claim Nasser is bound by Shiboleth's acceptance under agency principles. The plaintiffs cite Nasser's instructions to Shiboleth, including those made in front of Dweck's family members, as well as Shiboleth's history of settling disputes for Nasser.

Lastly, the plaintiffs assert that Nasser's opposition to the plaintiffs' motion is made in "bad faith" and that several of Nasser's representations to this court were knowingly false. According to the plaintiffs, this conduct justifies an award of the

51. Shiboleth Dep. 44.

52. JX 95. The letter gave the following seven examples: (1) "... You were pleasantly surprised to hear that I had just concluded with Bill that there will be no cap on damages payable by her and proceeded to ask me when I will be getting the agreement signed by her;" (2) "Furthermore, two days later, you asked me again what is happening with Gila's signature and I notified you that Bill had notified me that a deal is a deal and both Kurt and I will have the signed agreement without delay ...;" (3) "You should also remember that you have told not only Michael Goodman, Gila's husband, but also Isaac and Haim, her brother and said to me and to Kurt at various times that you did not intend to read the Settlement Agreement. You added that when Kurt and I will tell you to sign the agreement you shall do so ...;" (4) "A couple of days later ... you called me and basically had three justifiable observations to the Supplemental Agreement, even though it had been signed ... we corrected the Supplemental Agreement to make these changes ...;" (5) "... [Y]ou instructed Isaac to sign the agreement on your behalf and have the Hong Kong legal entity sign the revised Supplemental Agreement;" (6) "You told me to delay the execution of the Settlement Agreement by Isaac on your behalf and the Hong Kong company until I will be getting Gila and Haim's consent to the subletting ... I told you that I do not see any problems in getting their consent, your answer was to get their consent first and execute the Settlement Agreement second;" (7) "... [Y]ou asked Mike Friedman to again amend the Supplemental Agreement regarding certain points. The revised Supplemental Agreement was sent to you for your comments hoping that upon my return from Poland I would try to convince Bill Wachtel to agree to the additional changes knowing that if he declines, the deal as was agreed upon before will stand."

attorneys' fees incurred in connection with the present motion.

The defendants argue that, while Nasser permitted Shiboleth to conduct the negotiations and Shiboleth agreed to the settlement, he did not have the authority to bind Nasser to an agreement. The defendants further argue that Shiboleth was unfit to conduct such negotiations or enter into a settlement because of his prior representation of Dweck, Dweck's family members, and Kids. According to the defendants, Heyman represented Nasser in the settlement negotiations and Heyman never expressly agreed to the settlement.

## III.

### A. *Nasser Is Bound To The Settlement Agreement*

■ "[A]n attorney of record in a pending action who agrees to the settlement of [a] case is presumed to have lawful authority to make such an agreement."[53] Heyman testified that while he understood that Shiboleth was actually authorized to enter into the settlement, he understood that he was not vested with that authority. For that reason Heyman testified that he tried "very hard" not to demonstrate an acceptance of the settlement to Wachtel.[54] While it is possible that Heyman's words and actions amounted to a binding expression of acceptance, the court finds it unnecessary to consider that issue since both Shiboleth's authority to settle and his manifestation of acceptance are so clear.

Regardless of Shiboleth's close relationship with Nasser, this court cannot presume that Shiboleth had lawful authority to enter into the settlement agreement because he was not the attorney of record. Instead, the court must look to agency law to determine whether Shiboleth had the authority to bind the defendants to the agreement. Since Shiboleth testified that he agreed to the settlement,[55] Shiboleth's authority is the only issue for this court to decide.

■ "Agency is defined as 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' "[56] "It is well settled that questions of agency are not subject to absolute rules but, rather, turn on the facts of the individual case."[57]

■ In the normal course of business dealing, there are three separate sources of an agency relationship.[58] First, actual authority is expressly granted authority either orally or in writing.[59] Second, implied authority is a derivation of actual authority and often means "actual authority either (1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts

53. *Aiken v. Nat'l Fire Safety Counsellors,* 127 A.2d 473, 475 (Del.Ch.1956).

54. Tr. 120–22.

55. Shiboleth Dep. 8–9.

56. *United States v. Schaltenbrand,* 930 F.2d 1554, 1560 (11th Cir.1991) (citing RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958)).

57. *Fisher v. Townsends, Inc.,* 695 A.2d 53 (Del.1997) (internal citation and quotation marks omitted).

58. *Liberty Mut. Ins. Co. v. Enjay,* 316 A.2d 219, 222 (Del.Super.Ct.1974).

59. *Billops v. Magness Const. Co.,* 391 A.2d 196, 197 (Del.1978); *Liberty,* 316 A.2d at 222.

known to the agent."[60] Third, apparent authority "is such power as a principal holds his [a]gent out as possessing or permits him to exercise under such circumstances as to preclude a denial of its existence."[61] The plaintiffs claim that there is sufficient evidence to support a finding that Shiboleth was vested with all three sources of authority to enter into the settlement.

### 1. *Actual Authority*

■ With respect to actual authority, Shiboleth and Heyman testified that Nasser granted Shiboleth authority to settle the litigation. At his deposition, Shiboleth testified that he "clearly" had the authority to agree to the settlement "[b]ased on what [he] heard many times from Albert Nasser."[62] According to Shiboleth, Nasser told him, with regard to signing the settlement agreement, "do what you want or what you understand."[63] Shiboleth, based on 20 years of representing Nasser and having settled numerous cases for him, understood this to mean that he was "authorized to settle the case."[64] Shiboleth also testified that he spoke with Nasser after Dweck capitulated on the cap provision and that Nasser was "ecstatic" and willing to settle upon receipt of an executed agreement.[65] While Nasser testified that he never authorized Shiboleth to bind him to a settlement agreement, on direct examination Nasser stated that he instructed Shiboleth that "he can talk in my name" in settling the litigation.[66] In addition, in his February 18 letter, Shiboleth reminded Nasser of his authority and identified seven different occasions when Nasser agreed to the settlement.[67]

---

60. RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006).

61. *Liberty*, 316 A.2d at 219.

62. Shiboleth Dep. 9. Despite being listed as a live witness in the pre-trial order, Shiboleth did not appear at the hearing and instead traveled to Tel Aviv. In an attempt to secure his attendance, the plaintiffs' counsel "asked defendants' counsel whether they would produce him, and they said they would not." Tr. 241. In addition, the defendants' counsel refused to contact Shiboleth and stated they would oppose a subpoena. *Id.* While the plaintiffs made no formal effort to procure Shiboleth's attendance, it is clear that the defendants could have assisted in getting Shiboleth to appear at the hearing. Indeed, Nasser testified that he was in contact with Shiboleth immediately before the hearing, including as soon as the morning of the hearing. *Id.* at 218. While drawing no conclusions from Shiboleth's absence, this court notes the defendants' clear ability to secure his attendance.

63. Shiboleth Dep. 41; JX 95.

64. Shiboleth Dep. 82.

65. *Id.* at 8 ("Q. Did you ever tell Bill Wachtel on November 19 that once the ... final executed settlement was signed by the plaintiffs, the defendants would sign the agreement, and the action would be discontinued with prejudice? A. Yes. I didn't use that terminology, but after I spoke to Albert, and he told me that ... he agreed, that, you know, the settlement will become settlement provided that Gila will sign it, because he had doubts.").

66. Tr. 149. For the sake of completeness, this court must note the Nasser's nephew, Itzhak Djemal, was entirely unconvincing as a witness at the hearing. According to Djemal, Shiboleth told him that he had gotten the requisite authority from Nasser. *Id.* at 230. As discussed above this is inconsistent with Shiboleth's far more credible testimony. In addition, Djemal testified that he told Nasser that Shiboleth thought he had the authority and that Nasser rejected this idea. *Id.* at 231–32. Djemal even testified that he confronted Shiboleth on this matter and that Shiboleth replied "[w]ell, I think I have it and don't worry. I will deal with it later." *Id.* at 232.

67. It is important to note that Shiboleth's testimony and the corroborating statements in his February 18 letter are entirely credible given his long-standing and continuing close personal and business relationship with

Nasser also instructed Heyman that Shiboleth had the authority to settle the litigation. As previously noted, Heyman testified that in August 2007 he spoke to Nasser concerning Shiboleth's settlement authority and Nasser told him that Shibboleth was instructed to "get it done." [68] Heyman quite reasonably took this to mean Shiboleth was authorized to "settle the case." [69] Given his careful testimony and evident attention to detail, it is unlikely Heyman misconstrued Nasser's instructions and improperly operated under the belief that Shiboleth had the authority to settle the case.

The likelihood that Nasser authorized Shiboleth to agree to the settlement is also supported by the cancellation of Dweck's deposition. As Heyman testified at the hearing, Nasser was adamant that the litigation should proceed absent a fully-executed settlement. [70] Significantly, when Nasser decided not to execute the agreement, Shiboleth testified that Nasser "never suggested [Shiboleth] didn't have authority" and that they only discussed the facts relating to the settlement. [71]

Nasser argues that since the settlement agreement includes terms that he considers "non-negotiable," it is unenforceable. These supposed "non-negotiable" terms are the three provisions Nasser identified at the outset of the dispute and were the subject of the August 2007 discussions with Heyman and Shiboleth. Foremost, the record demonstrates that Nasser granted Shiboleth the authority to settle the litigation. Nasser consistently told Shiboleth and Heyman that he would "blindly" sign a settlement at their direction. [72] Heyman testified that Nasser never informed him, in the months before November 19, of any conditions or prerequisites to Shiboleth agreeing to a settlement. [73] Thus, regardless of Nasser's objection to these terms, he is bound by the settlement agreement approved by Shiboleth.

The record indicates that Nasser consented to these terms in his August 2007 discussion with Heyman. The provisions were also included in the drafts circulated on November 13 and 16. Heyman discussed the November 13 draft with Nasser in detail, relating Nasser's specific objections to Wachtel. At that time, Heyman was aware of these purportedly "non-negotiable" terms, yet Nasser did not object to them because he told Heyman and Shiboleth that he would no longer "interpose those issues as objections." [74] Thus, it is illogical to assume that, despite Nasser's known objections, Shiboleth and Heyman permitted the settlement to proceed with these terms in the agreement and understood the litigation to be settled on November 19.

Finally, the defendants argue that Shiboleth was unfit to negotiate the settlement due to his prior representation of Dweck, her family members, and Kids. This argument lacks merit. Nasser was fully informed of Shiboleth's prior repre-

Nasser. Shiboleth has a clear personal and economic incentive to protect Nasser in this action. Indeed, in his February 18 letter, Shiboleth states: "I am not going to volunteer this information, however I do not see any way out of telling the truth in court if I am subpoenaed."

68. Heyman Dep. 7.

69. *Id.* at 8.

70. Tr. 108–109; Tr. 14–15; Heyman Dep. 26.

71. Shiboleth Dep. 40–41.

72. *Id.* at 26; Heyman Dep. 82; Tr. 96–97.

73. Heyman Dep. 9.

74. *Id.*

sentation of these parties at all times during the settlement negotiations and still directed Shiboleth to settle the litigation. In fact, Nasser had and continues to have ongoing significant business relations with at least two of Dweck's brothers.[75] As Shiboleth reminded Nasser in his February 18 letter:

> You know very well, since we discussed it in the past, there have been no attorney client relations between [Dweck or her brother] and my firm at least for the last 3–5 years and therefore the assertion in the [January 30 letter] ... is both inappropriate and unacceptable.[76]

Shiboleth also testified that "there was no conflict ... we discussed it many times ... [Dweck] and me, [Dweck's brother] and me, [Nasser] and me, but first and foremost everyone knew that I'm Albert Nasser's attorney."[77] At the hearing,

Nasser conceded that Shiboleth never misled him regarding this prior representation.[78] Moreover, Shiboleth's work for Dweck was almost entirely related to Kids, of which Nasser was the majority stockholder. The only separate legal work Shiboleth performed for Dweck was assisting her in a prenuptial agreement, which Nasser oversaw and advised Shiboleth about.[79]

In short, this dispute involved two stockholders, both with representation to protect their interests.[80] As discussed, Shiboleth's representation of Nasser spanned over 20 years in numerous capacities, and his representation of Dweck and Kids was minor and related to Nasser's interests.[81]

## 2. Implied Authority

■■ Regardless of Nasser's purported understanding that he expressly reserved the right to sign off on the settle-

75. Tr. 21.

76. JX 95.

77. Shiboleth Dep. 48–49.

78. Tr. 193.

79. Shiboleth Dep. 51–52.

80. Tr. 11.

81. Similarly, the defendants cite to language in the settlement agreement and supplemental agreement identifying Shiboleth's firm as a mediator to undermine his ability to settle the case. Specifically, the defendants cite section 9.1, which states: "The Parties agree that they have requested and authorized the law firm of Shiboleth, Yisraeli, Roberts & Zisman, LLP ("SYRZ") to mediate the disputes between them, to engage in settlement negotiations between the Parties .... The Parties acknowledge that they are aware that SYRZ has ... represented Dweck and members of her family and her Affiliates as well as Nasser[,] members of the Nasser family and the Nasser Entities and their respective Affiliates.... Each Party hereby waives any claim by reason of a conflict of interest or lack of

impartiality on the part of SYRZ and that SYRZ shall not be liable to any Party for any act or omission on its part." JX 1 § 9.1. Section 4.1 of the supplemental agreement includes similar language. This language was clearly inserted to preclude Dweck and the other plaintiffs from citing Shiboleth's prior representation of the parties as an excuse to avoid the settlement agreement. As Heyman testified: "I knew that Mr. Shiboleth had a relationship with Ms. Dweck ... and that he was, you know, currently representing Mr. Nasser and Kids. And I thought he was essentially trying to make sure that he was protected from any claim of conflict by the Dweck side." Tr. 135–36. In fact, Michael Friedman, an attorney at Shiboleth's firm, inserted the "mediator" language and at his deposition stated that it was intended to exculpate the Shiboleth firm. Moreover, Nasser reviewed this provision and, after discussing it with Heyman, did not have any objections. Shiboleth Dep. 90–93. Further evidence that Shiboleth served as Nasser's attorney in the settlement negotiations is found in another provision of the settlement agreement, which states "[t]he Dweck Parties shall pay the fees of William Wachtel ... and the Nasser Entities shall pay the fees of Amnon Shiboleth...." JX 1 at 3743.

ment agreement, his actions in connection with the settlement negotiations and his course of dealings with Shiboleth over 20 years make clear that Shiboleth had at least implied authority to settle the litigation. As previously noted, implied authority is a form of apparent authority that can extend the scope of the agency relationship under certain circumstances.[82] More specifically:

> [I]mplied authority is authority that the agent reasonably believes he has as a result of the principal's actions. This may be proved by evidence of acquiescence [of the principal] with knowledge of the agent's acts, and such knowledge and acquiescence may be shown by evidence of the agent's course of dealing for so long a period of time that acquiescence may be assumed.[83]

Nasser directed Shiboleth to settle the action and permitted him to speak "in his name."[84] Moreover, he told Shiboleth that he would execute any agreement that Shiboleth and Heyman presented to him. Given this behavior and Shiboleth's long-standing close personal and business relationship with Nasser, it was reasonable for Shiboleth to assume he was authorized to settle the litigation.[85] At his deposition, Shiboleth testified that he had settled many cases for Nasser in the past and that in those circumstances Nasser would instruct him to:

> [D]o what you want. That means settle it in our implied terms. That's the way we communicate for twenty years. When he tells me to do what you understand or what you want, in terms of settling a case ... you are ... authorized to settle the case.[86]

Shiboleth also testified that it was always his "role" to settle cases for Nasser.[87] Nasser's New York counsel, Stephen Schaffer, supported this testimony at his deposition, when he testified that, in connection with a lawsuit he filed against Nasser concerning a fee dispute, he "ran to [Shiboleth], who I would describe as the only person who is able to settle any case with [Nasser]...."[88] When Shiboleth entered into the settlement agreement on the terms he knew to be acceptable to Nasser he understandably thought Nasser's signature was a "formality."[89]

### 3. Apparent Authority

█ Finally, while such a determination is not necessary to grant the plaintiffs' motion, Nasser is also likely bound by Shiboleth's actions based on apparent authority. " 'A principal is bound by an agent's apparent authority which he knowingly permits the agent to assume of which he holds the agent out as possessing.' "[90]

---

82. RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006).

83. Montgomery v. Achenbach, 2007 WL 3105812, at *2 (Del.Super.Ct. July 26, 2007) (alteration in original).

84. See 3 AM.JUR. 2d Agency § 87 (2002) ("[T]he authority of an agent to make a contract on behalf of the principal may be inferred from authority to conduct a transaction if the making of the contract is incidental to the transaction, usually accompanies it, or is reasonably necessary to its accomplishment.").

85. See id. ("The determination of implied [actual] authority depends on the relationship between the principal and agent and not on what a third party believes about the relationship.").

86. Shiboleth Dep. 81–82.

87. Id.

88. Schaffer Dep. 26.

89. Shiboleth Dep. 86.

90. Liberty, 316 A.2d at 223 (citing Crumlish v. Price, 266 A.2d 182, 183–84 (Del.1970)); see

As Shiboleth recounted in his letter to Nasser:

> [You] should also remember that you have told not only Michael Goodman, [Dweck's] husband, but also Isaac and Haim, her brothers and said to me and to [Heyman] at various times that you did not intend to read the Settlement Agreement. You added that when [Heyman] and I will tell you to sign the agreement you shall do so." [91]

One of these instances was a meeting with Shiboleth and Goodman only weeks before the November 19 execution of the settlement agreement. While Nasser denies that he discussed this with Goodman, and states he spoke in Hebrew, his testimony, again, carries little evidentiary weight.

## B. *The New York Action*

The defendants contend that since New York law, under C.P.L.R. 2104, requires that an out of court settlement agreement be in writing, the oral agreement between the parties cannot terminate the New York action. In response, the plaintiffs assert that while this court cannot "order the dismissal of the New York action, it can require the parties to specifically perform the settlement agreement." [92] Therefore, according to the plaintiffs, this would render an examination of New York law unnecessary because enforcing the settlement would "include ordering the defendants to execute and file a stipulation dismissing the New York Action." [93]

 The plaintiffs' position hinges on whether Delaware law should be applied to the settlement agreement. The agreement contains a Delaware choice of law provision that states:

> This Settlement Agreement and all proceedings or decisions of the Financial Arbitrators and the Judicial Arbitrator hereunder shall be governed and construed in accordance with the laws of the State of Delaware.[94]

"Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction." [95] In this case, the entities underlying the dispute are Delaware entities contracting to settling litigation pending in a Delaware court. Thus, there is a material relationship with Delaware.[96] In addition, before a dispute arose, the parties operated with the understanding that Delaware law would apply to the settlement agreement.

 The defendants do not directly dispute the application of Delaware law.

---

also RESTATEMENT (THIRD) OF AGENCY § 2.03 (2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").

91. JX 95. Pursuant to New York law, any settlement agreement, "other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney...." N.Y. C.P.L.R. (2008) 2104.

92. Pls.' letter at 3.

93. *Id.*

94. JX 1 at 3746.

95. *J.S. Alberici Const. Co. v. Mid–West Conveyor Co.*, 750 A.2d 518, 520 (Del.2000).

96. *See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1046 (Del.Ch.2006) ("In this case, Delaware law clearly has a material relationship to the transaction among the Buyer, the Seller, and the Company. The Seller was a Delaware entity that sold a Delaware corporation to a Delaware limited partnership that used a Delaware corporation to acquire the Company.").

Rather, they argue "[t]he choice of law provision is enforceable only if the alleged contract is valid and enforceable, which is the very issue before the Court." [97] As already determined, however, the settlement agreement is enforceable and that determination must be made applying Delaware law. Therefore, the defendants' argument is unavailing.

In the circumstances, it is clear that this court should order specific enforcement of the settlement agreement, including the stipulation of dismissal of the New York action. Indeed, "[e]quity respects the freedom to contract, and dictates that both [parties to the settlement] should receive the benefit of their bargain through specific performance." [98] The settlement agreement expressly provides for a stipulation dismissing both the consolidated Delaware cases and the New York action.[99] The agreement also provides for releases by the parties "releasing any and all claims between such parties from the beginning of time through the date of this Settlement Agreement...." [100]

The defendants argue that "the parties never reached any agreement and indeed never even negotiated concerning the terms of any stipulation of dismissal." [101] The defendants further argue that, since the stipulation and releases are not attached, there are several issues that are unclear from the settlement agreement and this lack of certainty precludes a ruling ordering their execution.[102]

Foremost, Shiboleth made clear at his deposition that there was no dispute concerning the content of the stipulation or the releases.[103] Such an accord is also evidenced by the fact that the parties agreed to a settlement without having prepared those documents. If the issues identified by the defendants were, in fact, so contentious, they would have arisen in the negotiations and any disagreement would have precluded the settlement.

In addition, contrary to the defendants' belated concerns, the settlement agreement clearly provides for the dismissal with prejudice of the New York action. This addresses the defendants' arguments regarding the application of the stipulation over those parties not named in the stipulation of dismissal. Even the parties not

---

97. Defs.' letter at 3.

98. *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1290 (Del.Ch.2004) (citing *Asten, Inc. v. Wangner Sys. Corp.*, 1999 WL 803965, at *6 (Del.Ch. Sept.23, 1999)).

99. As previously noted, Section 8.1.1 reads: "Stipulation dismissing the Litigation with prejudice except as to the matters set forth in this agreement and without cost, a copy of which is attached as Exhibit 8.1.1 hereto, executed and delivered by legal Counsel for each respective party thereto." JX 1 at 3744.

100. *Id.*

101. Defs.' letter at 4.

102. These include the following:
- Were the New York Defendants to be included in any stipulation of dismissal or would the claims against them continue, since they are not named as parties to the alleged stipulation of dismissal?
- If the claims against the New York Defendants were not released, could the terms of the settlement agreement, including Dweck's admissions of wrongdoing, be used in the continuing litigation against the New York Defendants?
- What claims would be carved out of any stipulation of dismissal, since Section 8.1.1 only provides that any stipulation dismissing the litigation be with prejudice except as to the matters set forth in this agreement?

Defs.' letter at 4–5. The defendants also argue that "the definition of the claims released would be a point of significant nuance" given the nature of the dispute. *Id.* at 5.

103. Shiboleth Dep. 110–11.

named in the stipulation of dismissal will be parties to a dismissal with prejudice of a substantially similar action.[104] With respect to the defendants' purported uncertainty concerning the claims included in the stipulation, the agreement unambiguously excludes only those claims arising out of the settlement agreement. In addition, the mere fact that the parties did not include copies of the stipulation or releases with the settlement agreement is not a bar to specific enforcement.[105] As the sophisticated counsel in this case undoubtedly know, a stipulation of dismissal and releases are straightforward form documents that require little drafting.

C. *The Plaintiffs Are Not Entitled To Attorneys' Fees*

The plaintiffs assert that the defendants necessitated the motion to enforce the settlement in bad faith and acted improperly in connection therewith. The plaintiffs cite the defendants' failure to produce Shiboleth's February 15 letter, despite it being responsive to their March 18 document requests, as well as several inconsistencies in Nasser's representations to this court.

 "Bad faith" is an exception to the well settled American Rule that each party pay his or her own attorneys' fees.[106] However, such an award of attorneys' fees is "unusual relief" reserved for "unusually deplorable behavior" limited to exigent circumstances.[107] "This court has broad discretion to award attorneys' fees where litigation was brought in bad faith or where bad faith conduct by one of the parties increases the costs of the litigation." [108] To be clear, this court does find much of Nasser's testimony to be wholly unconvincing, but there is insufficient evidence that Nasser vexatiously necessitated the plaintiffs' motion in an abuse of the judicial process.[109] There is also an insufficient record to determine the circumstances of the defendants' failure to produce the February 18 letter.

## IV.

For the foregoing reasons the motion to enforce the settlement agreement is GRANTED. Each party shall bear its own costs. IT IS SO ORDERED. The parties are directed to confer and submit a form of order within 10 days.

104. As in this litigation, the principal parties in the New York action are Nasser and Dweck.

105. *Cf. Clark v. Ryan*, 1992 WL 163443, at *5 (Del.Ch. June 17, 1992) ("Although three days later Ms. Stone wrote that her 'clients have had second thoughts concerning the settlement,' it is undisputed that the offer to settle already had been accepted by Willis' counsel. That the agreement was not reduced to a formal stipulation of agreement is irrelevant.") (emphasis omitted).

106. *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del.1998).

107. *Openwave Sys. Inc. v. Harbinger Capital Partners Master Fund I, Ltd.*, 924 A.2d 228, 245 (Del.Ch.2007); *Barrows v. Bowen*, 1994 WL 514868, at *2 (Del.Ch. Sept.7, 1994).

108. *In re SS&C Techs., Inc. S'holders Litig.*, 2008 WL 612256, at *7 (Del.Ch. Mar.6, 2008).

109. *See Barrows*, 1994 WL 514868, at *2.