# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MACROPHAGE THERAPEUTICS, INC., )
a Delaware corporation, )
                                   )
              Plaintiff, )
                                   )
           v. )       **C.A. No. 2019-0137-JRS**
                                     )
MICHAEL M. GOLDBERG, M.D., and )
M1M2 THERAPEUTICS, INC., )
                                     )
             Defendants. )

## MEMORANDUM OPINION

Date Submitted: March 16, 2021
Date Decided: June 23, 2021

Richard P. Rollo, Esquire, Sarah A. Clark, Esquire and Angela Lam, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Barry M. Kazan, Esquire of Mintz & Gold LLP, New York, New York; and Faith Charles, Esquire of Thompson Hine LLP, New York, New York, Attorneys for Plaintiff.

R. Karl Hill, Esquire of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware and Gregory Zimmer, Esquire of New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

While Delaware's contractarian proclivities encourage parties to control their contractual outcomes through private ordering, that control does not extend to the remedies a party may invoke when a perceived breach has occurred. In instances where one party believes the other has breached the contract, that party can acquiesce, stop performing and sue for total breach or continue performing and sue for partial breach. What he cannot do, however, is engage in extra-contractual self-help. Yet, that is precisely what the defendants in this action did when they surmised the plaintiff and others had breached contractual obligations owing to them. The self-help was unjustified and the defendants must be held accountable.

In 2015, Macrophage Therapeutics, Inc. ("Macrophage" or the "Company") was formed as a wholly owned subsidiary of Navidea Biopharmaceuticals, Inc. ("Navidea") for the purpose of developing therapeutic uses for Navidea's diagnostic products. In 2018, while Defendant, Michael M. Goldberg, M.D., served as director and CEO of Navidea, he collaborated with Navidea's board of directors to separate Macrophage from Navidea's control in order to attract investors in Macrophage. While Navidea was engaged in developing products to *diagnose* certain severe diseases, the goal of Macrophage was to find ways to use Navidea's intellectual property to *treat* those diseases in an effective manner. All parties agreed that Macrophage's growth would best be served by a structure that allowed Macrophage

1

to project to potential investors its independence from Navidea notwithstanding Navidea's sole ownership of Macrophage's common stock.

The parties' collaboration resulted in the execution of an agreement dated August 14, 2018 (the "August Agreement") whereby the parties expressed their intent to reach agreements that would create space between Navidea and Macrophage. Under the August Agreement, Dr. Goldberg would resign from his positions at Navidea and become the full-time CEO of Macrophage. The parties would also reach and prepare definitive agreements granting Dr. Goldberg a 5% economic stake in, and voting control of, Macrophage in exchange for the surrender of his preferred shares of Macrophage.

After execution of the August Agreement, the parties' efforts to negotiate definitive implementing agreements stalled and Dr. Goldberg became impatient. Rather than exercising his legal rights to enforce the contract, such as they were, Dr. Goldberg took matters into his own hands. He engaged in a series of conflicted transactions, unilaterally, to effectuate what he believed he was owed under the August Agreement. He created Defendant, M1M2 Therapeutics, Inc. ("M1M2"), transferred Macrophage's prized asset (the sub-license Navidea provided to Macrophage to perform its work) to M1M2, granted himself the 5% economic interest in M1M2 he believed he was meant to have in Macrophage and then gave himself immediate voting control of M1M2 (the "Challenged Transactions").

2

Dr. Goldberg engaged in the Challenged Transactions with no notice to Navidea or other stakeholders and with virtually no expert legal or financial advice.

Upon discovering the Challenged Transactions, Macrophage initiated this action against Dr. Goldberg and M1M2 alleging breaches of fiduciary duty, conversion and violations of Section 271 of the Delaware General Corporation Law ("Section 271") arising from Dr. Goldberg's unilateral and unauthorized transfer of Macrophage's prized asset to himself.[1] Following claim dispositive rulings of the Court on summary judgment, described below, this post-trial opinion focuses on the fiduciary duty and conversion claims.

Starting with the fiduciary duty claim, Macrophage argues that Dr. Goldberg, as a fiduciary, stood on both sides of the Challenged Transactions, thus triggering entire fairness review. This is not hotly disputed. Macrophage then argues that because the process and price were wholly unfair, Dr. Goldberg violated his duty of loyalty to Macrophage. In response, Dr. Goldberg argues that while the process leading to the Challenged Transactions may have been less than ideal, Macrophage

---

[1] The Section 271 claim alleged that Dr. Goldberg caused Macrophage to transfer substantially all of its assets to M1M2 without the approval of the Macrophage board of directors or stockholders. *See* 8 *Del. C.* § 271(a) ("Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its . . . assets . . . upon such terms and conditions and for such consideration . . . as its board of directors or governing body deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon . . . .").

received everything it bargained for in the August Agreement, thus demonstrating an abundantly fair price.

For reasons explained, Dr. Goldberg has failed to meet his entire fairness burden, mainly as relates to fair price, since he failed to prove that he paid any meaningful consideration in connection with the Challenged Transactions. Moreover, I reject Dr. Goldberg's unclean hands defense to the fiduciary duty claim. For reasons explained below, Dr. Goldberg has fallen well short of presenting the kind of facts that would support that exceptional defense.

With that said, Macrophage failed to prove anything more than nominal damages resulting from Dr. Goldberg's fiduciary duty breaches. The Challenged Transactions were unwound before any real harm was done. And, contrary to Macrophage's assertion, Dr. Goldberg's self-help and resulting breach of fiduciary duties are not of a nature or gravity that would justify shifting attorneys' fees.

Finally, as for Macrophage's claim that Dr. Goldberg converted certain Macrophage intellectual property in the Challenged Transactions, that claim fails for a simple reason. The evidence reveals that, to the extent Dr. Goldberg ever possessed any Macrophage IP, that IP and any other allegedly converted property have already been returned to Macrophage.

In all, Macrophage is left with a declaration that Dr. Goldberg breached his fiduciary duty of loyalty through the Challenged Transactions. The remedy for the breach is an award of nominal damages in the amount of $1.00.

## I. BACKGROUND

The facts are drawn from the parties' pretrial stipulation and evidence admitted at trial. The trial record consists of ten lodged depositions, 162 joint trial exhibits and testimony given during a three-day trial. The following facts were proven by a preponderance of the competent evidence.[2]

### A. Parties and Relevant Non-Parties

Plaintiff, Macrophage, is a Delaware corporation that operates as a wholly owned subsidiary of Navidea.[3]

Non-party, Navidea, is also a Delaware corporation.[4] Navidea trades on the New York Stock Exchange and is in the business of developing medical diagnostic and imaging products principally utilizing certain intellectual property licensed from the University of California San Diego ("UCSD").[5]

---

[2] I cite to the Joint Pre-Trial Stipulation and Order as "PTO ¶ __," the joint trial exhibits as "JX ___," the trial transcript as "Tr. __ (witness name)" and depositions lodged as evidence as "(Name) Dep. __."

[3] PTO ¶¶ 13–15.

[4] *Id.* ¶ 24.

[5] *Id.*

Defendant, Dr. Goldberg, was CEO of Navidea from September 2016 until August 14, 2018, and served as a member of the Navidea board of directors (the "Navidea Board") from November 2013 until August 14, 2018.[6] Until his termination from the position on February 20, 2019, Dr. Goldberg served as CEO of Macrophage.[7] He still holds his seat on the Macrophage board of directors (the "Macrophage Board").[8]

Defendant, M1M2, was a Delaware corporation created by Dr. Goldberg on February 4, 2019.[9] This Court declared the creation of M1M2 null and void *ab initio* in a summary judgment ruling delivered on June 12, 2019.[10]

Non-party, Platinum-Montaur Life Sciences, LLC ("Platinum-Montaur"), a Delaware limited liability company, is a preferred stockholder of Macrophage.[11]

---

[6] *Id.* ¶ 26.

[7] *Id.* ¶¶ 26, 44.

[8] *Id.* ¶ 26.

[9] *Id.* ¶ 27.

[10] *Id.*; *Macrophage Therapeutics, Inc. v. Goldberg*, C.A. 2019-0137-JRS at 5 (Del. Ch. June 12, 2019) (D.I. 92) (TRANSCRIPT) ("Summary Judgment Op.").

[11] PTO ¶ 28; JX 3 ("SPA").

Non-party, Dr. Claudine Bruck, has been a member of the Navidea Board since February 2018. She was appointed by Navidea to serve as one of its two representatives on the Macrophage Board on November 29, 2018.[12]

Non-party, Michael Rice, is the current chairman of the Navidea Board. He was appointed by Navidea to serve as one of its two representatives on the Macrophage Board on November 29, 2018.[13]

Non-party, Jed Latkin, was CFO of Navidea until August 14, 2018. Following Dr. Goldberg's resignation as Navidea's CEO in August 2018, Latkin assumed that role and has served in it since.[14] Following Dr. Goldberg's termination from Macrophage on February 20, 2019, Mr. Latkin also became CEO of Macrophage.[15]

## B. The Creation of Macrophage

Prior to the creation of Macrophage, Dr. Goldberg, acting as CEO of Navidea, realized that the intellectual property licensed from UCSD (the "Licensed IP")

---

[12] JX 57; Tr. 630:13–15 (Bruck); *id.* at 640:4–643:1 (Bruck).

[13] JX 57; Tr. 702:24–703:3 (Rice). After the trial of this matter, Dr. Goldberg filed a separate action in this Court challenging the appointments of Dr. Bruck and Mr. Rice to the Macrophage Board. *Goldberg v. Bruck, et al.*, C.A. No. 2020-1058-JRS. By opinion issued today, the Court granted a motion to dismiss this challenge on the ground that the appointments were authorized by the clear and unambiguous language of Macrophage's Certificate of Incorporation and Bylaws. *Goldberg v. Bruck, et al.*, C.A. No. 2020-1058-JRS (Del. Ch. June 23, 2021) (D.I. 25) (Opinion) ("Macrophage 225 Opinion").

[14] Tr. 42:14–21 (Latkin).

[15] *Id.* at 120:4–7 (Latkin).

7

permitted only diagnostic applications, not therapeutic applications.[16] Upon this realization, he acquired the therapeutic license on behalf of Navidea.[17] Macrophage, incorporated on January 23, 2015, was created to develop the therapeutic applications of Navidea's Licensed IP.[18] Where Navidea's focus was to exploit the Licensed IP to diagnose certain diseases, the plan for Macrophage was that it would focus on exploiting the Licensed IP to facilitate the treatment of those same diseases, and perhaps others.[19]

On March 11, 2015, Navidea granted Macrophage an exclusive license to use the Licensed IP through a sub-license agreement (the "Navidea Sub-License Agreement").[20] The Navidea Sub-License Agreement granted Macrophage the right to utilize the Licensed IP for therapeutic purposes (the "Navidea Sub-License") in exchange for 100% of the common stock of Macrophage.[21] On the other hand, it prohibited Navidea from using any of Macrophage's inventions or improvements

---

[16] *Id.* at 330:15–331:1 (Goldberg).

[17] *Id.*

[18] PTO ¶¶ 14–15.

[19] Tr. 15:9–19 (Latkin).

[20] PTO ¶ 25; JX 4 ("Navidea Sub-License") at Recitals, § 2.1(a).

[21] Navidea Sub-License at Recitals ("In consideration for the rights granted to [Macrophage] herein, [Macrophage] grants to [Navidea] 100% of the stock in [Macrophage].").

8

in therapeutics.[22]  Navidea was authorized to terminate the Navidea Sub-License if, among other reasons, Macrophage became insolvent.[23]  By its terms, the termination of the Navidea Sub-License Agreement triggers Macrophage's obligation to terminate its work under the Navidea Sub-License in a timely manner.[24]

On the same day the Navidea Sub-License Agreement was executed, Dr. Goldberg, Platinum-Montaur, with whom Dr. Goldberg had a long history, and Macrophage executed a Securities Purchase Agreement ("SPA").[25]  The SPA granted Dr. Goldberg and Platinum-Montaur certain preferred stock in Macrophage in return for Platinum-Montaur's pledge to invest at least $500,000 in Macrophage.[26]  As part of the agreement, the Macrophage Board was set at three members, with Dr. Goldberg appointed as Platinum-Montaur's sole representative.[27]  The SPA provided that Navidea was to appoint the other two board members.[28]  As a result of

---

[22] *Id.* §§ 2.4–2.5.

[23] *Id.* § 8.1(b).

[24] *Id.* § 8.4(a).

[25] SPA.

[26] *Id.* § 2.1(f).  The value of Dr. Goldberg's preferred shares granted in the SPA on an as-converted basis represents .04% of the outstanding capital stock of Macrophage, increasing to .08% if fully diluted.  Tr. 218:15–219:10 (Latkin).

[27] SPA § 5.6(a).

[28] *Id.*

9

the Navidea Sub-License and SPA, Navidea held 100% of Macrophage's common stock, representing approximately 99.9% of Macrophage's outstanding common stock on an as-converted basis.[29]

## C. The August Agreement

In June 2018, Rice, on behalf of Navidea, facilitated several introductions between Dr. Goldberg, on behalf of Macrophage, and potential investors in the hopes that Macrophage would secure investments for its various therapeutics projects.[30] None of the introductions panned out.[31] Some of the investor prospects expressed concern that Navidea's control over Macrophage made Macrophage less attractive.[32] With this in mind, Navidea and Dr. Goldberg agreed they should take steps to separate Navidea's control over Macrophage to increase the chances of a significant outside investment.[33] This was born out of a recognition that, among other things, (1) most investors were likely well-versed in either diagnostics or therapeutics but

---

[29] Tr. 18:17–19 (Latkin).

[30] *Id.* at 29:7–12 (Latkin); *id.* at 704:23–705:20 (Rice).

[31] *Id.* at 706:1–4 (Rice); *id.* at 480:9–10 (Goldberg) ("There were no investments in Macrophage.").

[32] *Id.* at 358:11–23 (Goldberg) (explaining how potential investors would report: "I'm not interested in imaging. How do I know where the money is going to go? Who is going to control it? Who is in control? You are in control of both[?] That doesn't make any sense").

[33] *Id.* at 706:11–14 (Rice) ("[W]hat we tried to figure out here is . . . how we can help him raise capital. And, ultimately, that led to the separation of the two companies.").

10

not both; (2) Dr. Goldberg dedicating 100% of his time to therapeutics would breed investor confidence; and (3) if an investor was only interested in therapeutics, that investor would be more inclined to commit to Macrophage if it was confident Navidea could not seize Macrophage funds in service of its diagnostics business.[34]

Navidea appointed Dr. Bruck and Mr. Rice to a special committee (the "Special Committee") to negotiate with Dr. Goldberg a practical (but not actual) separation of Macrophage from Navidea.[35] The Special Committee, advised by its legal counsel, William Mower, with input from Navidea's then CFO, Jed Latkin, came up with a framework whereby Dr. Goldberg would (1) resign as CEO of Navidea to demonstrate his commitment to Macrophage; (2) take over the day-to-day management of Macrophage; (3) receive a more tangible ownership stake in Macrophage; and (4) control voting rights with respect to Macrophage.[36]

Discussions between the Special Committee and Dr. Goldberg eventually led to the execution of the August Agreement on August 14, 2018.[37] The August Agreement was a preliminary agreement that expressly contemplated future definitive agreements whereby Dr. Goldberg would (1) be issued 23.5 million shares

---

[34] *Id.* at 35:14–36:3 (Latkin); *id.* at 358:11–23 (Goldberg); *id.* at 706:15–707:11 (Rice).

[35] JX 25.

[36] Tr. 30:10–18 (Latkin); JX 37 ("August Agreement").

[37] PTO ¶ 29; August Agreement.

11

of Navidea common stock, (2) be granted 5% of Macrophage's common stock with super voting rights giving him control of Macrophage, (3) be provided nearly $1 million in severance payments from Navidea post-closing and (4) give up his Macrophage preferred stock.[38] Macrophage would also receive a line of credit from Navidea not to exceed $750,000 for certain working capital expenses.[39] For its part, Navidea would be permitted to appoint one observer to the Macrophage Board.[40]

The August Agreement contemplated that certain "Transaction Documents" would be executed at some time in the future to effectuate a final transaction substantially similar to the terms set forth in the August Agreement.[41] Nevertheless, Dr. Goldberg agreed to resign from his position as director and CEO of Navidea effective as of the date of execution of the August Agreement.[42]

The August Agreement was executed by Dr. Goldberg for himself and Macrophage and Mr. Latkin for Navidea.[43] Throughout the process of negotiating

---

[38] August Agreement.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*; JX 31.

[43] August Agreement.

the August Agreement, the Special Committee was represented by Mr. Mower.[44]

Dr. Goldberg, a non-lawyer, represented himself and Macrophage.[45] Dr. Goldberg's

decision to forego legal counsel in the negotiation of the August Agreement is

surprising since, on June 18, 2018, in his capacity as Macrophage CEO, he retained

the Israeli law firm, Meitar Liquornik Geva Leshem Tal ("Meitar"), to serve as

Company counsel.[46]

### D. Negotiations Stall Following the August Agreement

In September 2018, Navidea's counsel, Mr. Mower, sent draft implementing

agreements to Dr. Goldberg.[47] Negotiations stalled when, in mid-October, Navidea

informed Dr. Goldberg that an issue had arisen with the New York Stock Exchange

regarding the 23.5 million Navidea shares that were to be issued to Dr. Goldberg.[48]

By late September, Navidea expressed to Dr. Goldberg that it was reluctant to

execute implementing agreements because Dr. Goldberg still had not positioned

Macrophage to operate independently from Navidea. For example, Dr. Goldberg

---

[44] Tr. 787:8–10 (Mower).

[45] Tr. 483:1–9 (Goldberg).

[46] JX 21; JX 22; Tr. 485:10–486:15 (Goldberg). Meitar stepped in to represent Dr. Goldberg in a discreet capacity after the August Agreement was executed. Tr. 486:5–15 (Goldberg).

[47] JX 41.

[48] Tr. 428:9–429:17 (Goldberg).

had not organized a management team, nor had he established a bank account in Macrophage's name so that it could receive proceeds from the $750,000 line of credit contemplated in the August Agreement.[49] Navidea's reluctance intensified when it learned that Dr. Goldberg had hired a consultant, J. Thelander Consulting, to evaluate the compensation Dr. Goldberg should be paid as CEO of Macrophage.[50] Navidea questioned the need for, and propriety of, this engagement given that the August Agreement plainly addressed the compensation Dr. Goldberg was to be paid.[51]

### E. The November Macrophage Board Meeting

By November 2018, Dr. Goldberg had grown impatient with Navidea's stalling.[52] The frustration came to a head on November 21, 2018, when Dr. Goldberg called a meeting of the Macrophage Board to discuss his plans for the Company.[53]

---

[49] Tr. 47:17–48:12 (Latkin); *id.* at 207:15–208:6 (Latkin).

[50] *Id.* at 47:5–16 (Latkin).

[51] *See id.*; *see also* August Agreement (providing Dr. Goldberg an economic stake in Macrophage, super voting rights and $978,000 in severance, but notably, making no mention of his post-closing compensation except to say that "Goldberg releases . . . any and all claims . . . including but not limited to claims for any compensation").

[52] JX 54.

[53] *Id.* At this time, Dr. Greene and Dr. Goldberg were the only Macrophage directors, with Alec Goldberg attending the November 21 meeting as an observer. *Id.*; Tr. 501:3–6 (Goldberg).

14

The meeting was attended by his son, Alec Goldberg, and Dr. Mark Greene.[54] According to the draft minutes of the meeting, Dr. Goldberg reported to his son and Dr. Greene that: (1) "he ha[d] sold his relevant IP to a partnership of his 4 children who have each individually assigned certain IP rights to the partnership as well"; (2) the partnership would "license on an exclusive basis all relevant IP to [Macrophage] . . . in return for 20% of the equity in Macrophage"; (3) Macrophage will ultimately "license its IP to the Partnership for all therapeutic areas not covered by the license from the partnership to [Macrophage]"; and (4) Macrophage would "fill [its] open board seat . . . with Alec Goldberg . . . effective immediately.[55] Dr. Goldberg also purported to: (1) issue Macrophage shares to himself, his family and Dr. Greene, (2) convert his Macrophage preferred shares into 5% of Macrophage common stock with super voting rights and (3) grant Dr. Greene convertible preferred stock.[56] Once implemented, these measures would have left Navidea with 52% of Macrophage's common stock and loss of control.[57]

While the draft minutes of the November 21 meeting suggest that Dr. Goldberg had already taken several of the actions he described during the

---

[54] JX 54.

[55] *Id.*

[56] *Id.*

[57] *Id.*

15

meeting, it does not appear that any of the actions actually occurred.[58] Indeed, according to Mr. Latkin, from Navidea's perspective, there is no evidence that Dr. Goldberg ever took steps to execute on the plan he outlined on November 21.[59] And the record contains no evidence of what "IP" Dr. Goldberg was referring to when he mentioned that he and his children had sold or assigned IP to "a partnership," even though Dr. Goldberg's counsel reaffirmed the existence of Dr. Goldberg's IP in a December 18, 2018 letter to Navidea.[60]

### F. Dr. Bruck and Mr. Rice's Appointments to the Macrophage Board

Even though Navidea owned all of Macrophage's common stock, Dr. Goldberg did not apprise Navidea of his plans to restructure Macrophage and

---

[58] Tr. 443:4–20 (Goldberg).

[59] *Id.* at 264:14–265:6 (Latkin) (expressing his belief, regarding the implementation of actions contemplated at the November 21 Macrophage Board meeting, that he "do[es] not think that has happened").

[60] JX 54 ("[Dr. Goldberg] informed the board that he has sold his relevant IP to a partnership of his 4 children."); JX 62 ("Upon reviewing the matter from . . . Dr. Goldberg's position as the owner of certain intellectual property necessary for Macrophage to succeed. . . ."); Tr. 392:8–10 (Goldberg); *id.* at 614:17–615:14 (Goldberg). Dr. Goldberg's unwillingness to explain specifically what IP he purportedly "sold," or what IP he possessed that was "necessary for Macrophage to succeed," ultimately diminished his overall credibility. Tr. 498:21–499:1 (Goldberg) (addressing whether he knew what IP was sold, he noted "I actually thought about this since my deposition. I have an idea. I have a guess, but I have no records that confirm it"); *id.* at 500:14–20 (Goldberg) ("I'm pretty sure -- the timing, based on that, leads me to believe what it probably was because that is . . . the biggest, most important IP that I personally have. So I would suggest that that probably is what is was, but I don't remember for sure.").

dilute Navidea.[61]  Nevertheless, Navidea had grown suspicious that Dr. Goldberg might engage in self-dealing.[62]  Accordingly, on November 29, 2018, Navidea executed a written consent as authorized by Macrophage's governing documents (1) removing every director from the Macrophage Board other than Dr. Goldberg and (2) appointing Dr. Bruck and Mr. Rice to the Macrophage Board.[63]

## G. The Creation of M1M2 and Purported Transfer of the Navidea Sub-License

While Dr. Goldberg apparently elected not to implement the plan he blueprinted at the November 21 Macrophage Board meeting, his desire to remedy his disagreements with Navidea through self-help remained.  Unbeknownst to Navidea, on February 4, 2019, Dr. Goldberg formed M1M2 as a Delaware corporation.[64]  M1M2's certificate of incorporation authorized the issuance of "95 shares of Common Stock" and "5 shares of Super Voting Common Stock."[65]

---

[61] Tr. 563:2–15 (Goldberg) (illustrating Dr. Goldberg's lack of consent from anyone at Navidea regarding a restructuring of Macrophage).

[62] Tr. 640:16–641:17 (Bruck).

[63] JX 57; Tr. 640:4–643:1 (Bruck).  As noted, the Court rejected Dr. Goldberg's post-trial challenges to these appointments in the Macrophage 225 Opinion.

[64] JX 66; PTO ¶ 36.

[65] JX 66.

The "5 shares of Super Voting Common Stock" carried 20 votes per share, compared to a single vote for each of the "95 shares of Common Stock."[66]

The following day, on February 5, the two directors of newly formed M1M2, Dr. Goldberg and Alec Goldberg, held M1M2's first board meeting. The first order of business was to elect Dr. Goldberg as CEO of M1M2.[67] Next, the M1M2 board approved two transactions that are at the heart of this dispute. In the first Challenged Transaction, Dr. Goldberg, signing on behalf of both Macrophage and M1M2, caused Macrophage to enter into a sub-license agreement with M1M2 (the "M1M2 Sub-License").[68] The M1M2 Sub-License granted M1M2 "an exclusive sub-license to all rights, property and interests transferred from Navidea to [Macrophage]" under the Navidea Sub-License Agreement in exchange for a grant to Macrophage of 100% of the common stock of M1M2.[69] Consistent with his past practice, Dr. Goldberg did not apprise Macrophage's other stockholders, Navidea and Platinum-Montaur, or the other Macrophage Board members, Dr. Bruck and Mr. Rice, that he had just

---

[66] *Id.*

[67] JX 69.

[68] JX 67.

[69] *Id.* ¶¶ 4, 6.

18

transferred substantially all of Macrophage's assets to an entity that he and his family controlled.[70]

In the second Challenged Transaction, Dr. Goldberg, again signing on behalf of Macrophage, executed a "Unanimous Resolution of the Shareholders of M1M2," whereby Macrophage, as the sole common stockholder of M1M2, resolved "to issue to Dr. Goldberg five (5) shares of M1M2 Super Voting Common Stock in order to effectuate the satisfaction of [Macrophage's] contractual obligations to Goldberg under the August Agreement."[71] This created a structure where Dr. Goldberg maintained a 5% economic interest in M1M2 but controlled 100 votes for his five shares, compared to 95 votes controlled by Macrophage (and, indirectly, Navidea).[72] In other words, Dr. Goldberg granted himself voting control of M1M2 and, by extension, control of the Navidea Sub-License.

## H. Navidea Learns of the Challenged Transactions

On the day after he executed the Challenged Transactions, February 6, 2019, Dr. Goldberg emailed Dr. Bruck and Mr. Rice to notice a special meeting of the

---

[70] Tr. 467:23–468:1 (Goldberg); *id.* at 563: 4–24 (Goldberg); *id.* at 645:11–15 (Bruck); JX 98.

[71] JX 68; *see also* PTO ¶ 38 (noting that the "Unanimous Resolution of the Shareholders of M1M2" signed by Dr. Goldberg on behalf of Macrophage "caused M1M2 to issue to Dr. Goldberg five (5) shares of M1M2 Super Voting Common Stock").

[72] JX 68; JX 69.

Macrophage Board to be held on February 11, 2019.[73]  The purpose of the meeting, per the notice, was to update the Macrophage Board "about actions/discussions relating to bringing Macrophage into compliance with its obligations to Michael Goldberg, M.D., under the terms of the August [] Agreement."[74]  Because Dr. Goldberg did not believe Dr. Bruck and Mr. Rice were duly appointed Macrophage Board members, he invited them to attend as Macrophage Board observers.[75]

At the February 11 Macrophage Board meeting, Dr. Goldberg informed Dr. Bruck and Mr. Rice for the first time that he had formed M1M2, executed the M1M2 Sub-License, and caused M1M2 to issue 95 shares of M1M2 common stock to Macrophage and 5 shares of M1M2 super voting stock to himself.[76]  The telephone "meeting" lasted less than five minutes; Dr. Goldberg walked through what he had done and then hung up.[77]

---

[73] PTO ¶ 39; JX 71.

[74] JX 71.

[75] Tr. 559: 6–15 (Goldberg) ("I was the only member of the board meeting.  [Dr. Bruck and Mr. Rice] were invited as observers to observe the meeting.").

[76] PTO ¶ 40; Tr. 561: 3–8 (Goldberg); *id.* at 644:14–17 (Bruck) (noting that on the call "Dr. Goldberg informed us of the creation of a new company that he had transferred the assets of Macrophage Therapeutics to"); *id.* at 719:17–720:16 (Rice) ("He basically, at that meeting, told us that he was moving the IP from Macrophage Therapeutics into a separate company, a Newco essentially."); Goldberg Dep. 81:19–88:3.

[77] Tr. 719:17–720:16 (Rice).

Later that day, Dr. Bruck, in her capacity as a Macrophage director, sent Dr. Goldberg an email requesting certain information related to the Challenged Transactions.[78] Dr. Goldberg responded on February 13, informing Dr. Bruck that he would not comply with the request because he did not accept that Dr. Bruck was a member of the Macrophage Board.[79] He did, however, allow that a Macrophage shareholder, such as Navidea, could request the information and he would promptly provide it.[80] Rather than contest the rejection, on February 14, Mr. Latkin, in his capacity as CEO of Navidea, sent a letter to Dr. Goldberg demanding documents related to the Challenged Transactions.[81] Dr. Goldberg responded that Mr. Latkin could inspect the documents by traveling from Navidea's offices in Dublin, Ohio to Dr. Goldberg's lawyer's offices in Hatfield, Pennsylvania, and thus ended Navidea's attempt to obtain documents related to the Challenged Transactions.[82]

---

[78] JX 73; JX 74.

[79] JX 75.

[80] *Id.* ("If Navidea or you would like to request the documents in some format other than a demand from a 'Board Member of MT', or designate an observer, or even request as a shareholder of MT, the documents will be provided.").

[81] JX 77.

[82] JX 80; Tr. 113:14–114:6 (Latkin) (noting his decision not to visit Dr. Goldberg's lawyer's office was based on the belief that "it would just lead [him] on a wild goose chase").

21

On February 15, 2019, the Navidea Board met and, among other things, discussed (1) terminating the Navidea Sub-License, (2) filing a lawsuit against Dr. Goldberg and (3) recommending to the Macrophage Board that it consider terminating Dr. Goldberg as Macrophage CEO and appointing Mr. Latkin in his place.[83] On February 19, Mr. Latkin, in his capacity as CEO of Navidea, terminated the Navidea Sub-License on the ground that Macrophage was insolvent.[84] And, on February 20, the Macrophage Board resolved to terminate Dr. Goldberg from his position as CEO of Macrophage and appoint Mr. Latkin to fill the position.[85] The ground for termination was Dr. Goldberg's attempt to consummate the Challenged Transactions.[86] On the same day as Dr. Goldberg's termination, Macrophage filed this lawsuit.

---

[83] JX 155.

[84] JX 84.

[85] Tr. 119:4–7 (Latkin); PTO ¶ 44; JX 89.

[86] Tr. 119:8–19 (Latkin) ("He was terminated because of the self-dealing and the other issues that had arisen over the last several weeks."); *id.* at 649:6–13 (Bruck) (noting the Macrophage Board determined that "Michael Goldberg was prepared to do things that appeared very unlawful, that we could not leave him in that position and he had to be replaced"); *id.* at 723:11–724:9 (Rice) ("[E]verybody was worried that there was something going on, which obviously there was something going on.").

## I. Procedural History

Macrophage filed its Complaint on February 20, 2019, followed by its Amended Complaint on March 22, 2019.[87] On February 22, 2019, Plaintiff moved for a Status Quo Order.[88] Following oral argument on March 1, this Court entered a Status Quo Order that differed from the order proffered by Dr. Goldberg.[89] Relevant here, the order provided that (1) the Macrophage Board shall consist of Dr. Goldberg, Dr. Bruck and Mr. Rice and (2) Dr. Goldberg was barred, without prior written authorization from the Macrophage Board, from: (a) "hold[ing] himself out as the CEO of the Company"; (b) "hold[ing] himself out as having the authority to act, or to authorize any action, on behalf of the Company . . . except through Board action"; (c) "purport[ing] to act or authorize any action on behalf of the Company . . . except as authorized by the Board"; "(d) transfer[ing], encumber[ing], exchang[ing], expend[ing], pledg[ing], loan[ing], or otherwise dispos[ing] of, directly or indirectly, any Company . . . asset"; and (e) "disparag[ing] the Company, Jed Latkin, Joel Kaufman, or any other Board member in a communication with any

---

[87] D.I. 1; D.I. 36 ("Am. Compl."); PTO ¶ 2.

[88] D.I. 12.

[89] D.I. 31 ("Status Quo Order").

(i) Company employee, independent contractor, partner, vendor, supplier, or (ii) other person involved, directly or indirectly, with the Company."[90]

The Amended Complaint comprises six counts. Count I asserts a breach of the duty of loyalty claim against Dr. Goldberg related to the Challenged Transactions; Count II asserts a breach of the duty of care claim against Dr. Goldberg related to the Challenged Transactions; Count III asserts a claim for conversion against Dr. Goldberg related to the Challenged Transactions; Count IV asserts a claim for declaratory judgment that the Challenged Transactions are null and void; Count V asserts a claim for breach of fiduciary duty against Dr. Goldberg related to Dr. Goldberg's lack of disclosure of records to directors and stockholders of Macrophage regarding the Challenged Transactions; and Count VI asserts conversion against Dr. Goldberg related to his possession of certain of Macrophage's corporate documents.[91]

On April 12, 2019, Macrophage moved for summary judgment and Defendants moved to dismiss or stay the Amended Complaint, and, on May 8, 2019, Macrophage moved for an order finding Dr. Goldberg in contempt for violating the Status Quo Order.[92] On May 22, 2019, I heard argument on all three motions and,

---

[90] PTO ¶ 4; Status Quo Order ¶ 4.

[91] Am. Compl. ¶¶ 41–75.

[92] PTO ¶ 6; D.I. 45; D.I. 47; D.I. 60.

at the conclusion of the hearing, denied Defendants' motion to dismiss or stay and granted Macrophage's motion to hold Dr. Goldberg in contempt, while reserving judgment on Macrophage's motion for summary judgment.[93]

Defendants sought dismissal on the basis that the August Agreement includes a forum selection clause declaring New York the exclusive forum to resolve litigation arising out of the agreement.[94] I rejected that argument upon concluding the issues of whether the Challenged Transactions violated the Delaware General Corporation Law, were products of breaches of fiduciary duty or resulted in conversion did not depend on an interpretation or enforcement of the August Agreement.[95]

Macrophage sought to hold Dr. Goldberg in contempt for violating the Status Quo Order by failing to return Company property (namely a laptop, iPad Pro and two iPhones), forwarding or deleting emails owned by Macrophage and disparaging Macrophage's employees (Mr. Latkin and Joel Kaufman) to third parties.[96] I granted

---

[93] *Macrophage Therapeutics, Inc. v. Goldberg*, C.A. 2019-0137-JRS (Del. Ch. May 22, 2019) (D.I. 105) (TRANSCRIPT) ("MTD and Contempt Op.").

[94] *Id.* at 74–75.

[95] *Id.* at 77–78. The parties are actively litigating breach of contract claims associated with the August Agreement in the United States District Court for the Southern District of New York. PTO ¶ 29; *In re Navidea Biopharmaceuticals, Inc.*, Case No. 1:19-cv-01578-VEC.

[96] MTD and Contempt Op. at 79.

the motion, required Dr. Goldberg to return the devices in dispute and admonished him not to disparage current management to customers and vendors during the pendency of the litigation.[97]

As for the motion for summary judgment, Macrophage sought judgment on all of its claims, arguing that the Challenged Transactions were void as a matter of law under Section 271, Dr. Goldberg had breached his fiduciary duties by engaging in the Challenged Transactions and the Challenged Transactions resulted in the unlawful conversion of Macrophage's property.[98] In a June 12, 2019 ruling, I denied Macrophage's motion for summary judgment as relates to the fiduciary duty and conversion claims (Counts I–III and V–VI) because there were genuine issues of material fact related to, among other things, the identity and ownership of certain of the allegedly misappropriated property and the extent of Dr. Goldberg's self-interest in the Challenged Transactions.[99]

As for Count IV, however, I granted summary judgment upon concluding that the Challenged Transactions violated Section 271 as a matter of law. Macrophage argued that the unilateral transfer of the Navidea Sub-License from Macrophage to M1M2 constituted a transfer of substantially all of Macrophage's assets without

[97] *Id.* at 80–82.

[98] Summary Judgment Op. at 5.

[99] *Id.* at 13–14.

proper approval.[100]  Dr. Goldberg argued that Section 271 did not apply to the Challenged Transactions because (1) there was no transfer of substantially all of Macrophage's assets to M1M2, (2) Dr. Bruck's and Mr. Rice's approval was not necessary and (3) the statute does not apply to transfers to wholly owned subsidiaries.[101]  I rejected Dr. Goldberg's arguments on several grounds.

First, I determined that the undisputed facts revealed that "the assets transferred to M1M2 through the M1M2 sublicense constitute all or substantially all of Macrophage's assets."[102]  In this regard, I noted that the undisputed purpose of Macrophage is to develop therapeutics utilizing the Navidea Sub-License and that the sublicense was Macrophage's "primary asset."[103]  While Dr. Goldberg argued the existence of other research projects might exceed the value of the Navidea Sub-License, he failed to demonstrate any specific value for these projects and, in any event, could not show that the projects did not depend upon the IP transferred under the Navidea Sub-License.[104]

---

[100] *Id.* at 6–7.

[101] *Id.* at 6–13.

[102] *Id.* at 7.

[103] *Id.*

[104] *Id.* at 7–8.

Next, in response to Dr. Goldberg's argument that he need not have obtained approval from Dr. Bruck or Mr. Rice prior to initiating the Challenged Transactions because neither were duly appointed members of the Macrophage Board, I determined that, even assuming *arguendo* Dr. Goldberg was the sole Macrophage Board member at the time of the Challenged Transactions, he failed to convene a proper board meeting or obtain proper stockholder consent.[105] And, finally, as to whether M1M2 was a wholly-owned subsidiary, I determined that, given Dr. Goldberg's post-transaction control over M1M2 through the super voting stock, M1M2 could not conceivably be classified as a wholly-owned subsidiary of Navidea.[106]

Having narrowed the issues, the Court convened a three-day trial from December 1, 2020 through December 3, 2020. Trial focused on three key issues: (1) whether Dr. Goldberg engaged in actionable wrongdoing in connection with the Challenged Transactions as alleged by Macrophage; (2) whether Macrophage's own alleged wrongdoing should serve as a basis to deny it any recovery as a matter of equity; and (3) whether Macrophage has proven damages resulting from

---

[105] *Id.* at 9.

[106] *Id.* at 9–12.

Dr. Goldberg's proven wrongdoing. Post-trial closing arguments were presented on March 16, 2021, and the matter was submitted for decision that day.[107]

## II. ANALYSIS

Macrophage alleges Dr. Goldberg's engagement in the Challenged Transactions violated his fiduciary duties to Macrophage because he stood on both sides of the transaction, engaged in self-dealing and did not prove that the transactions were entirely fair. The Challenged Transactions, coupled with Dr. Goldberg's alleged theft of Macrophage's IP, documents and certain devices, are also alleged to give rise to actionable conversion.

Dr. Goldberg resists Macrophage's claims, arguing: (1) the Challenged Transactions were entirely fair since they simply mirrored the terms of the August Agreement; (2) the doctrine of unclean hands precludes Macrophage from recovery; and (3) in any event, Macrophage failed to prove any damages.

I start by briefly addressing Dr. Goldberg's attempt to reargue post-trial this Court's prior summary judgment determination that the Challenged Transactions transferred substantially all of Macrophage's assets to M1M2. I then evaluate Macrophage's fiduciary duty claims through the lens of the applicable standard of review, entire fairness. Upon finding that Macrophage has prevailed on its breach

---

[107] D.I. 212 ("Oral Arg. Tr.").

of fiduciary duty claims, I address Dr. Goldberg's unclean hands defense and reject it. Next, I consider Macrophage's claimed damages and find that it has proven entitlement to nothing more than nominal damages. I also address Macrophage's claim that it is entitled to payment of its attorneys' fees. I find this argument without merit. Finally, I address Macrophage's conversion claims and find Macrophage has either failed to meet the *prima facie* elements of conversion or failed to prove damages.

## A. The Challenged Transactions Resulted in the Transfer of Substantially All of Macrophage's Assets

Dr. Goldberg seeks to relitigate the question of whether the Challenged Transactions constituted a transfer of substantially all of Macrophage's assets, in violation of Section 271. For good reason, Macrophage argues that Dr. Goldberg's grossly out of time request for reargument is barred for that reason and barred by the law of the case doctrine because the factual landscape remains unchanged since the Court granted summary judgment on that issue. I agree on both fronts.

A motion for reargument must be filed within five (5) days "after . . . the receipt of the Court's decision."[108] Dr. Goldberg's attempt to reargue the Court's summary judgment opinion comes just shy of two years too late.

---

[108] Del. Ct. Ch. R. 59(f).

Moreover, "once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears."[109]  In other words, "this court may not change the law of the case when the material facts have remained constant throughout the subsequent course of the same litigation."[110]

Here, no "compelling reason" exists to revisit the Court's ruling that the Challenged Transactions violated Section 271 by transferring substantially all of Macrophage's assets to M1M2 without proper authorization.[111]  According to Dr. Goldberg, new facts have emerged that demonstrate the following valuable Macrophage "assets" were not transferred to M1M2 in the Challenged Transactions: (1) hundreds of thousands of dollars in NIH funding, (2) a patent applied for by Navidea in the field of therapeutics, (3) the balance of the $750,000 credit line and (4) Macrophage's ongoing research projects under the Navidea Sub-License.[112]

---

[109] *May v. Bigmar, Inc.*, 838 A.2d 285, 288 n.8 (Del. Ch. 2003) (internal quotations omitted).

[110] *T.V. Spano Bldg. Corp. v. Dep't of Nat. Res. & Env't Control*, 1992 WL 1364297, at *1 (Del. Super. Ct. Sept. 3, 1992), *aff'd*, 628 A.2d 53 (Del. 1993); *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990) (same); *see also Izquierdo v. Sills*, 2004 WL 2290811, at *4 n.28 (Del. Ch. June 29, 2004) ("The law of the case doctrine applies as a constraint to reconsideration of legal issues.").

[111] *See* Summary Judgment Op. 6–12.

[112] Defs.' Post-Trial Answering Br. ("AB") (D.I. 198) at 28.

Contrary to Dr. Goldberg's assertions, the material facts have remained constant between this Court's summary judgment ruling and trial. At the threshold, the absence of any evidence regarding the value of these newly identified Macrophage "assets" relative to the Navidea Sub-License is fatal to Dr. Goldberg's effort to reargue the summary judgment ruling.[113] The Court determined on undisputed evidence that the Navidea Sub-License was Macrophage's "primary asset," and nothing presented at trial undermines that conclusion.[114]

Moreover, each supposed newly discovered asset is either clearly not a Macrophage asset, not a newly identified asset or not an asset separate and apart from the Navidea Sub-License. Starting with NIH funding, this was a grant held in the name of Navidea for the life of the grant, and Dr. Goldberg has not even hinted that he ever understood this to be part of Macrophage.[115] And, to the extent any part of the NIH grant that was dedicated to therapeutics work was actually a Macrophage asset, it only became a Macrophage asset under the Navidea Sub-License that

---

[113] *T.V. Spano*, 1992 WL 1364297, at *1 (finding that while the facts presented may have been slightly different than relied upon, there was no demonstrated "change in the material facts").

[114] Summary Judgment Op. at 7.

[115] Tr. 131:18–132:2 (Latkin) ("[W]e also informed [Dr. Goldberg] that the NIH grant was in Navidea's name.").

Dr. Goldberg purported to transfer to M1M2.[116] Similarly, the disputed patent was a patent filed in Navidea's name in March 2019 and, again, was either a Navidea asset or became a Macrophage asset only because of the Navidea Sub-License.[117] As for the remaining balance on the $750,000 line of credit to be extended under the August Agreement, the existence of that facility was not a fact discovered after this Court's summary judgment ruling. Dr. Goldberg knew of the line of credit, such as it was, as of the date of the August Agreement, and yet he did not proffer that line of credit as a Macrophage asset that somehow diluted the value or importance of the Navidea Sub-License he purported to transfer to M1M2 until well after summary judgment.[118] In any event, a line of credit can hardly be classified as an asset; it is unquestionably debt.[119] Finally, as relates to Macrophage's ongoing research, the Court rejected this as a separate asset in its summary judgment ruling and Dr. Goldberg has proffered no legitimate reason to revisit that issue.[120]

---

[116] *Id.*

[117] Tr. 153:5–18 (Latkin).

[118] JX 65.

[119] *Henke v. Trilithic Inc.*, 2005 WL 2899677, at *10 (Del. Ch. Oct. 28, 2005) (classifying a line of credit as debt).

[120] Summary Judgment Op. at 8 ("[D]efendants now resort to arguing that outstanding Macrophage research projects have the potential to create value that exceeds the sublicense. But any value from these projects is speculative, and, as plaintiff points out, likely dependent upon the intellectual property that is the subject of the sublicense.").

Thus, the law of the case is that the Challenged Transactions violated Section 271. Dr. Goldberg has not demonstrated any changes of material fact since that ruling that would justify a determination that the Navidea Sub-License constituted anything but substantially all of Macrophage's assets.

## B. The Fiduciary Duty Claims

Macrophage argues Dr. Goldberg breached his fiduciary duties of loyalty and care by executing the Challenged Transactions (1) while standing on both sides, (2) without informing the rest of the Macrophage Board or stockholders in a timely manner and (3) without any sufficient legal advice or representation, at least in his roles as Macrophage's CEO and a Macrophage director.[121] As discussed below, a finding that Dr. Goldberg stood on both sides of the Challenged Transactions, as a conflicted fiduciary, mandates that Dr. Goldberg prove the Challenged Transactions were entirely fair. He has not carried that burden.

---

[121] Macrophage, in essence, acknowledges that its claim for breach of fiduciary duty arising from Dr. Goldberg's failure to produce records relating to the Challenged Transactions (Count V) is moot since it has obtained those records during the course of this litigation. JX 66; JX 67; JX 68; JX 69; *see generally* OB (focusing its fiduciary duty claims on the Challenged Transactions themselves rather than failure to produce documents related to the Challenged Transactions).

### 1. Standard of Review

"Directors of a Delaware corporation owe two fiduciary duties—care and loyalty."[122]  "The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes."[123]  "Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision."[124]  The fiduciary duty of care, on the other hand, demands that corporate fiduciaries act in good faith and "consider all material information reasonably available in making business decisions."[125]  Of course, where, as here, the operative certificate of incorporation includes an exculpation clause, as authorized by Section 102(b)(7) of the DGCL, directors are

---

[122] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 32 (Del. Ch. 2014).

[123] *Steiner v. Meyerson*, 1995 WL 441999, at *2 (Del. Ch. July 19, 1995).

[124] *U.S.W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996).

[125] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 747 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (quoting *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000)) (internal quotations omitted).

shielded from monetary liability associated with any duty of care violation.[126] Such exculpation does not apply, however, to violations of the duty of loyalty.[127]

The appropriate starting point for any analysis of alleged corporate director misconduct is the business judgment rule.[128] The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[129] It operates as "a rule of evidence that

---

[126] 8 *Del. C.* § 102(b)(7); *McPadden v. Sidhu*, 964 A.2d 1262, 1273 (Del. Ch. 2008). I recognize that this provision does not shield Dr. Goldberg from liability resulting from duty of care violations in his capacity as a corporate officer. *McPadden*, 964 A.2d at 1275 (noting that 102(b)(7) protection is "only available to directors"). Because I find that Dr. Goldberg breached his duty of loyalty and that the Challenged Transactions are not entirely fair, I need not analyze whether Dr. Goldberg, as a corporate officer, breached his duty of care. No separate relief is requested resulting from Dr. Goldberg's duty of care breaches.

[127] 8 *Del. C.* § 102(b)(7) (prohibiting exculpation for a variety of faithless acts including "(i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under section 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit"); *In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *53 (Del. Ch. Mar. 1, 2021) ("But because the Complaint pleads a claim for breach of the duty of loyalty against Skaggs, he is not entitled to exculpation.").

[128] *Wayne Cty. Emps.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *10 (Del. Ch. July 24, 2009), *aff'd*, 996 A.2d 795 (Del. 2010) ("The appropriate starting place in evaluating plaintiff's fiduciary duty claims, however, is with the well-established presumption of the business judgment rule . . . .").

[129] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *see also Orman v. Cullman*, 794 A.2d 5, 19–20 (Del. Ch. 2002) (same). I assume, as the parties have assumed, without deciding, that the business judgment presumption applies to corporate officers in the same manner it applies to corporate directors. *But see* Lyman Johnson, *Unsettledness in*

places the initial burden of proof on the plaintiff."[130]  A plaintiff can rebut the business judgment presumption in a number of ways.  Relevant here, "[i]f corporate fiduciaries stand on both sides of a challenged transaction, an instance where the directors' loyalty has been called into question, the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction."[131]

Dr. Goldberg has not meaningfully contested that he stood on both sides of the Challenged Transactions or that entire fairness is the appropriate standard of review.[132]  The tacit concessions are well founded.  Dr. Goldberg signed the M1M2 Sub-License on behalf of Macrophage and M1M2, purportedly as the CEO (and perhaps as a director) of both companies.[133]  He also signed the Unanimous

---

*Delaware Corporate Law: Business Judgment Rule, Corporate Purpose*, 38 Del. J. Corp. L. 405, 413 (2013) ("[I]t is not settled today whether in cases involving corporate officers, judges will doctrinally deploy the business judgment rule in the same all-encompassing manner that it has been used for corporate directors.").  Even if the presumption applies to Dr. Goldberg as an officer, however, that presumption is still overcome by his stance on both sides of the Challenged Transactions and the benefits he received from those transactions at the expense of Macrophage stockholders.

[130] *Emerald P'rs v. Berlin*, 787 A.2d 85, 91 (Del. 2001) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995)).

[131] *Oliver v. Boston Univ.*, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006) (internal quotations omitted).

[132] Tr. 588:11–17 (Goldberg); *id.* at 589:8–9 (Goldberg) ("But you're right.  I was on both sides, and I didn't see any way around that."); *see also* AB at 29 (assuming the application of entire fairness).

[133] JX 67.

Resolution of the Shareholders of M1M2 in his capacity as CEO and director of Macrophage, M1M2's only purported shareholder up to that point.[134] These documents permitted Dr. Goldberg to go from possessing as little as .04% of Macrophage's common stock on an as-converted bases to 5% of M1M2's common stock with full voting control.[135] This, in turn, gave Dr. Goldberg the exclusive right to use and control Macrophage's primary asset, the Navidea Sub-License. Dr. Goldberg's actions clearly implicate his duty of loyalty to Macrophage stockholders; he acted as a director and officer for both Macrophage and M1M2 and did so in a manner that directly benefited himself.[136] These facts, alone, rebut the business judgment presumption and require Dr. Goldberg to demonstrate that the Challenged Transactions were entirely fair.

### 2. Dr. Goldberg Failed to Prove the Challenged Transactions Were Entirely Fair

"Entire fairness has two components: fair dealing and fair price. 'Fair dealing' focuses on the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation. 'Fair price' includes all relevant factors

---

[134] JX 68; PTO ¶ 38.

[135] JX 67; JX 68.

[136] Tr. 537:2–10 (Goldberg) (admitting to possessing a vested personal interest in the Challenged Transactions).

relating to the economic and financial considerations of the proposed transaction."[137]

"[T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[138]

The Challenged Transactions can principally be understood as Dr. Goldberg's attempt at self-help to achieve what he believed he was owed under the August Agreement. "[I]t is black-letter law that when one party to a contract materially breaches, the nonbreaching party has two options: it can terminate the agreement and sue for total breach, or it can continue the contract and sue for partial breach."[139] "There is, however, no third option allowing the party claiming a breach to invoke 'self-help' and only perform those obligations it wishes to perform."[140]

---

[137] *Carlson v. Hallinan*, 925 A.2d 506, 531 (Del. Ch. 2006) (internal quotations omitted). Fair price is commonly characterized as the most important consideration in determining the fairness of the transaction. *See, e.g.*, *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 311 (Del. Ch. 2006) ("[T]he overriding consideration [in an entire fairness review of a transaction] is whether the substantive terms of the transaction were fair.").

[138] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[139] *ESPN, Inc. v. Off. of Comm'r of Baseball*, 76 F. Supp. 2d 383, 397 (S.D.N.Y. 1999); *see also* Farnsworth, Contracts § 8.19 (3d ed.1999) ("Once a material breach has continued long enough to be total, the injured party can choose either to terminate the contract and claim damages for total breach, or not to terminate the contract and claim damages for partial breach.").

[140] *ESPN*, 76 F. Supp. 2d at 398; *see also Gould v. Gould*, 2012 WL 3291850, at *13 (Del. Ch. Aug. 14, 2012) ("Instead, Jerry engaged in self-help that has added significantly to the complexity of this litigation. By not pursuing the appropriate avenues for relief available to him and required by the orders of this Court and the directives of the Trustee, Jerry acted improperly."); *Rockwell Automation, Inc. v Kall*, 2004 WL 2965427, at *3

Fundamentally, rather than pursue whatever claims he might have against Navidea in court, Dr. Goldberg exploited the parties' inability to come to terms on definitive agreements implementing the August Agreement by surreptitiously removing Navidea from the process and taking the Navidea Sub-License for his own. In doing so, he failed to follow a fair process and ultimately failed to deliver a fair price in breach of his duty of loyalty.

### a. Fair Process

From the beginning, Dr. Goldberg had no regard for utilizing an effective process to protect the rights of Macrophage's stockholders.[141] This Court found in its summary judgment ruling, and confirmed at trial, that Dr. Goldberg did not even alert, much less attempt to obtain the approval of, either the two other members of the Macrophage Board or the Macrophage stockholders before transferring valuable Macrophage assets out of the entity for his own use.[142] In fact, he did not tell anyone

---

(Del. Ch. Dec. 15, 2004) (discussing that self-help is not an appropriate means to enforce perceived contractual rights or remedy perceived contractual breaches).

[141] Tr. 360:20–361:5 (Goldberg).

[142] Summary Judgment Op. at 9; Tr. 467:23–468:1 (Goldberg); *id.* at 563: 4–9 (Goldberg); *id.* at 645:11–15 (Bruck); JX 98.

outside of his circle about the Challenged Transactions until six days after he executed them.[143]

Dr. Goldberg maintains he was not obliged to advise or seek approval from Dr. Bruck or Mr. Rice because neither was a duly appointed member of the Macrophage Board.[144] Setting aside the fact that this Court has found, as a matter of law, that Dr. Bruck and Mr. Rice were properly appointed to the Macrophage Board,[145] the fact remains that Dr. Goldberg purported to approve the Challenged Transactions without even convening a Macrophage Board meeting, presumably because he knew that any notice of a meeting would alert an already suspicious Navidea that Dr. Goldberg might be contemplating a self-dealing transaction.[146]

Apparently recognizing that the lack of process posed a problem for him, Dr. Goldberg made a half-hearted attempt at trial to invoke advice of his personal counsel as evidence of fair process, even though he acknowledged that Macrophage

---

[143] PTO ¶ 40; Tr. 561: 3–8 (Goldberg); *id.* at 644:14–645:15 (Bruck); *id.* at 719:17–720:16 (Rice); Goldberg Dep. 81:19–88:3.

[144] Summary Judgment Op. at 9; Tr. 559:6–15 (Goldberg); AB at 31.

[145] Macrophage 225 Opinion.

[146] Summary Judgment Op. at 9 ("But even if Dr. Goldberg were the sole voting member of Macrophage's board at the time of the challenged transactions, he was required to convene a proper meeting of the board to obtain board approval and then was statutorily required to obtain Navidea's approval as a stockholder.").

was not represented by counsel in connection with the Challenged Transactions.[147]

In other words, in transactions orchestrated by the same individual acting as CEO of both parties to the transactions, that CEO secured legal counsel for one party, M1M2, but chose to leave the other party, Macrophage, unrepresented.[148] Under the circumstances, it is not surprising there was no evidence the Challenged Transactions were the product of any, much less meaningful, negotiations. Simply stated, Dr. Goldberg failed to prove a fair process because the overwhelming evidence revealed there was no process at all.

### b. Fair Price

According to Dr. Goldberg, because the Challenged Transactions mimicked the transactions contemplated by the August Agreement, Macrophage, by definition, received a fair price.[149] He testified his sole intent in effectuating the Challenged Transactions "was to replicate as closely as possible the August Agreement with the

---

[147] Tr. 555:12–556:13 (Goldberg); *see also* JX 98 at ROG #7 ("Dr. Goldberg did not receive any legal advice from any attorney in his capacity as the CEO of Macrophage, regarding the formation of M1M2. No attorney acted on behalf of Macrophage in regard to the formation of M1M2.").

[148] *Sealy Mattress Co. of New Jersey v. Sealy, Inc.*, 532 A.2d 1324, 1336 n.19 (Del. Ch. 1987) (holding that independent legal advice is one aspect in determining the fairness of a particular dealing).

[149] AB at 30; *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 788 (Del. Ch. 2011) ("Our Supreme Court has recognized, however, that, at least in non-fraudulent transactions, 'price may be the preponderant consideration . . . .'" (quoting *Weinberger*, 457 A.2d at 711)).

exact same license as founded Macrophage."[150]  But even if effectuating the August

Agreement was an appropriate standard for evaluating fair price, which Macrophage

disputes, Dr. Goldberg has failed to prove that he engaged in a transaction that

duplicated what the parties would have agreed to had they ever been able to finalize

contracts implementing the August Agreement.

To be sure, the August Agreement was an expression of intent that both parties

understood would have to be finalized in definitive agreements.[151]  When the

negotiation of those definitive agreements failed to move at the pace Dr. Goldberg

believed they should, he decided to take matters into his own hands by effectuating

the Challenged Transactions.  To reiterate, through the Challenged Transactions,

Dr. Goldberg received a 5% economic interest and majority voting control of

M1M2, the entity that Dr. Goldberg created to control the exclusive rights to the

Navidea Sub-License, without providing any consideration.[152]  While the August

Agreement contemplated providing Dr. Goldberg an economic interest and majority

voting control in *Macrophage*, it did not contemplate that Dr. Goldberg could sweep

Navidea's Licensed IP out of Macrophage into an entity controlled by Dr. Goldberg

in which Navidea had no interest, particularly when Dr. Goldberg gave up nothing

---

[150] Tr. 413: 13–20 (Goldberg).

[151] August Agreement.

[152] JX 66; PTO ¶ 36.

in return for that new structure.[153]  The simple fact is that Navidea never agreed to final terms with respect to the disposition of the Navidea Sub-License following the August Agreement and there is absolutely no reason to believe it ever would have agreed to the terms Dr. Goldberg negotiated for himself in the Challenged Transactions.  Those terms were fundamentally unfair to Macrophage and its stockholders (other than Dr. Goldberg).

### 3. Unclean Hands

Dr. Goldberg argues the Court should decline to enter a judgment against him as a matter of equity because Macrophage comes to the Court with "unclean hands." As this court has oft-repeated, the doctrine of unclean hands rests on the maxim of equity that "[he] who comes into equity must do so with clean hands."[154] The doctrine reflects "a rule of public policy [that] protect[s] the public and the court against misuse by persons who, because of their conduct, have forfeited the right to have their claims considered."[155]  "The question raised by a plea of unclean hands is

---

[153] August Agreement.  The August Agreement contemplates that Dr. Goldberg would surrender his preferred shares in Macrophage in exchange for the grant of common stock and control rights.  *Id.* ("MT will redeem all shares of Goldberg's MT Preferred Stock and any warrants or other equity rights held by Goldberg in MT for no additional consideration other than Goldberg's rights in the Transaction.").  Yet, Dr. Goldberg presented no evidence that he performed that aspect of the August Agreement.  Tr. 538:18–540:12 (Goldberg).

[154] *Kousi v. Sugahara*, 1991 WL 248408, at *2 (Del. Ch. Nov. 21, 1991).

[155] *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991) (Allen, C.); *see also Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976)

whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit."[156] While courts of equity possess vast discretion when considering whether a plaintiff's unclean hands should act as a bar to relief, one hard and fast restraint is that "the plaintiff's inequitable conduct must have an 'immediate and necessary' relation to the claims for which the plaintiff seeks relief."[157]

Dr. Goldberg asserts two purported instances of misconduct that justify a finding of unclean hands. First, he argues that Mr. Latkin stripped Macrophage of the Navidea Sub-License on February 19, 2019, a day prior to the filing of this lawsuit, in an effort to avoid the August Agreement.[158] This conduct can hardly be classified as offensive, particularly given that the Navidea Sub-License Agreement permitted Navidea to cancel the Navidea Sub-License if Macrophage became

---

("[T]he purpose of the clean hands maxim is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy.").

[156] *Gallagher*, 1991 WL 158969, at *4.

[157] *Kousi*, 1991 WL 248408, at *2; *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 523 (Del. Ch. 1998); *see also Portnoy v. Cyro–Cell Int'l, Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008) ("The doctrine of unclean hands provides that a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim, regardless of its merit." (internal quotations omitted)).

[158] AB at 43–44.

insolvent (which it clearly was as of February 19, 2019).[159] But even if the termination of the Navidea Sub-License was offensive, that termination does not have an "immediate and necessary" relation to Macrophage's claims. The crux of Macrophage's allegations is that Dr. Goldberg participated in misconduct associated with the Challenged Transactions, occurring on February 4–5, 2019.[160] The termination of the Navidea Sub-License, occurring two weeks after Dr. Goldberg's misconduct, cannot conceivably be understood to relate to Dr. Goldberg's self-help and resulting breaches of fiduciary duty.

Second, Dr. Goldberg argues this lawsuit is nothing more than a bad faith effort to cause Dr. Goldberg to incur significant legal fees.[161] That claim is frivolous. Dr. Goldberg attempted to take for himself that which belonged to Macrophage. In doing so, he breached his duty of loyalty to Macrophage stockholders. Macrophage was absolutely justified in bringing this action to remedy (in this case undo) the harm caused by Dr. Goldberg's misconduct.[162]

---

[159] Navidea Sub-License § 8.1(b); JX 84. *But see In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 238 (Del. Ch. 2014) (accepting the doctrine of unclean hands where defendant made a showing of fraud).

[160] Am. Compl. ¶¶ 41–71.

[161] AB at 44.

[162] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 668 (Del. Ch. 2012) ("Breach of fiduciary duty is an equitable claim, and it is a maxim of equity that equity regards substance rather than form." (internal quotations omitted)); *Ravenswood Inv. Co., L.P. v. Estate of Winmill*, 2018 WL 1410860, at *2 (Del. Ch. Mar. 21, 2018), as revised (Mar. 22, 2018), *aff'd*,

Having failed to carry his burden to demonstrate that the conflicted Challenged Transactions were the product of a fair process that produced a fair price, Dr. Goldberg has failed to prove that he fulfilled his duty of loyalty with respect to the Challenged Transactions. He has likewise failed to make a showing of Macrophage's unclean hands to justify denying Macrophage any relief. Accordingly, judgment will be entered in favor of Macrophage on Count I of its Complaint.

### 4. Damages

Delaware law does not demand certainty in awarding damages so long as the plaintiff has proven the defendant committed a wrong and demonstrated that an injury occurred.[163] With that said, "a plaintiff must demonstrate that the defendant caused the injury and present a reasonable and factually supported basis for determining damages."[164]

---

210 A.3d 705 (Del. 2019) (finding a breach of fiduciary duty notwithstanding the lack of demonstrable damages).

[163] *Medek v. Medek*, 2009 WL 2005365, at *12 (Del. Ch. July 1, 2009).

[164] *Id.*; *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *39 (Del. Ch. Apr. 29, 2005) ("A prevailing party must prove its damages by preponderance of the evidence; absolute precision is not required but the proof may not be speculative either.").

Macrophage recognizes that the Challenged Transactions have been reversed, both by Navidea's revocation of the Navidea Sub-License and by this Court's summary judgment ruling declaring the Challenged Transactions null and void.[165] There is, therefore, no lasting harm sustained by Macrophage that can be remedied by damages. The question is whether Macrophage has proven harm that has not already been remedied by the Court's declaration that the Challenged Transactions are null and void.

Macrophage identifies three categories of alleged damages it associates with its breach of fiduciary duty claims: (1) the cost of litigation associated with unwinding the Challenged Transactions and holding Dr. Goldberg accountable, (2) reputational harm resulting from Dr. Goldberg's actions and (3) Dr. Goldberg's use of Macrophage funds for his own personal benefit.[166] I address the alleged reputational harm and misappropriation harm first, followed by the request for attorneys' fees.[167]

---

[165] JX 84; Summary Judgment Op. at 16–17.

[166] Pl.'s Opening Post-Trial Br. ("OB") (D.I. 190) at 51–52.

[167] I address attorneys' fees in a separate section because awarding such fees, even in the fiduciary duty context, is subject to a separate standard.

### a. Reputational Harm

Macrophage argues it incurred substantial reputational harm as Dr. Goldberg represented to industry participants and others that he alone controlled Macrophage, and then disparaged key Macrophage employees when they contested Dr. Goldberg's claims.[168] By way of example, Macrophage points to an exchange between Mr. Latkin and a member of the research team working with Macrophage at the University of Connecticut in which Mr. Latkin advised the research team of Dr. Goldberg's termination only to learn that Dr. Goldberg had just informed that same research team that he continued to speak for Macrophage and that others, including Mr. Latkin, did not.[169] Mr. Latkin testified about a similar exchange with Nai Fang Wang, a researcher at New York Medical College, who was also told by Dr. Goldberg that he was still CEO of Macrophage even after he had been terminated.[170]

While Mr. Latkin's need to set the record straight with Macrophage partners regarding Dr. Goldberg's status with Macrophage was no doubt a source of frustration, Macrophage presented no evidence that the confusion created by Dr. Goldberg's disinformation campaign caused tangible harm to the Company.

---

[168] OB at 51.

[169] Tr. 120:8–121:10 (Latkin), *id.* at 121:11–18 (Latkin); JX 86; JX 87.

[170] Tr. 122:21–123:15 (Latkin); JX 91.

While Macrophage is correct that "damages resulting from a breach of fiduciary duty are liberally calculated,"[171] the trial court cannot substitute its best guess at harm for actual evidence of harm.[172] Because there is no proven harm, there is no basis to award compensatory damages.[173]

### b. Dr. Goldberg's Use of Macrophage Funds for Personal Expenses

Macrophage next asserts that Dr. Goldberg utilized funds loaned to Macrophage from Navidea for his own benefit to pay: (1) Meitar to perform legal services ostensibly for Macrophage that actually benefited Dr. Goldberg personally, and (2) an outside consultant, Thelander, to develop a compensation package for

---

[171] *In re S. Peru*, 52 A.3d at 814; *see also Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996) ("[D]amages flowing from [a breach of fiduciary duties] are to be liberally calculated.").

[172] *Bozievich v. Moreau*, 2019 WL 4962694, at *2 (Del. Super. Ct. Oct. 8, 2019) (noting that speculation or conjecture are not enough to support a damages award). Indeed, counsel for Macrophage acknowledged at oral argument "that reputational harm outside of the legal fees that needed to be brought is something that may be incapable of precise determination. So, Macrophage would be requesting nominal damages in terms of compensating it for that harm." Oral Arg. Tr. at 19.

[173] *Medek*, 2009 WL 2005365, at *12 (requiring the demonstration of harm as a predicate to awarding compensatory damages). In *Southern Peru*, a case on which Macrophage leans with most of its weight, the court noted that even in cases where the court is attempting to remedy a breach of fiduciary duty, the court must have a "basis for an estimate of damages." *In re S. Peru*, 52 A.3d at 814; *see also Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000) ("Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages." (citation omitted)).

50

Dr. Goldberg as CEO of Macrophage even though his compensation (or lack thereof) had already been set.[174]

Starting with the Meitar fees, Mr. Latkin testified that, upon review of certain e-mail exchanges between Meitar and Dr. Goldberg, it appeared Meitar was providing advice on issues outside the scope of Macrophage's business.[175]  For example, it appears Meiter may have been giving Dr. Goldberg advice regarding the Navidea shares Dr. Goldberg was to receive under the August Agreement.[176]  Even assuming *arguendo* that the advice was personal to Dr. Goldberg, Macrophage's request for damages in the form of recoupment of fees fails because it has not presented evidence to link those fees to any of its breach of fiduciary duty claims relating to the Challenged Transactions.[177]  In other words, Macrophage presented no evidence that Meitar charged Macrophage fees in connection with Dr. Goldberg's efforts at self-help related to the August Agreement.

---

[174] OB at 52.

[175] Tr. 137:5–22 (Latkin); JX 42; JX 45; JX 47.

[176] *Id.*

[177] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *24 (Del. Ch. July 6, 2018) (holding that plaintiff must make a "showing that a sufficiently convincing causal linkage exists between the breach of duty and the remedy sought that makes the remedy an apt means of addressing the breach").

Macrophage's attempt to recover the Meitar legal fees as damages fails for another reason—it failed even to attempt to parse out Meitar's invoices and quantify how much of Meitar's work related to Dr. Goldberg's personal legal issues. While "mathematical certainty is not required," there must be a "basis for an estimate of damages."[178] That basis is lacking in the evidence here.[179]

Finally, the claim for damages related to Dr. Goldberg's hiring of a compensation consultant suffers from the same lack of evidence linking the claimed damages to the claimed wrongdoing. Macrophage argues that, utilizing Macrophage funds, Dr. Goldberg hired an outside consultant, Thelander, to work on a compensation package for himself without consulting the Macrophage Board and notwithstanding the fact that the August Agreement already set his compensation.[180] Again, even assuming the evidence supported that claim, the evidence does not support a link between those costs and the breaches of fiduciary duty related to the

---

[178] *In re S. Peru*, 52 A.3d at 814.

[179] *Medek*, 2009 WL 2005365, at *12. Macrophage asserts that as long as it proves the fact of damages, it need not establish those damages with precise certainty. *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015) ("Where the injured party has proven the fact of damages . . . the injured party need not establish the amount of damages with precise certainty 'where the wrong has been proven and injury established.'"). That is true. But "precise certainty" is not what I was looking for in the evidence. Rather, I searched for some basis in the evidence to reach a dollar amount that made sense. I came up short.

[180] OB at 52; Tr. 133:22–134:2 (Latkin); *id.* at 138:1–19 (Latkin); JX 65.

Challenged Transactions. In other words, a judgment requiring Dr. Goldberg to reimburse the Company for this consultant fee would not "address[] the breach[es]" Macrophage proved at trial.[181]

### c. Nominal Damages

In a fiduciary duty action, "plaintiffs need not plead (or prove at trial) that they have been injured as an element of their claim."[182] In the absence of sufficient proof of a specific injury, the court will issue a declaration that the defendant breached his fiduciary duties and award nominal damages.[183] Given that Macrophage failed to prove a causal link between its claimed damages and the proven breaches of fiduciary duty, the Court will issue the declaratory judgment Macrophage has requested and award nominal damages in the amount of $1.00.

---

[181] *Basho*, 2018 WL 3326693, at *24.

[182] *Orban v. Field*, 1993 WL 547187, at *5 (Del. Ch. Dec. 30, 1993).

[183] *Ravenswood*, 2018 WL 1410860, at *2 ("Consequently, all that can be awarded is a declaration that Defendants breached their fiduciary duties and an assessment of nominal damages against each Defendant in the spirit of equity."); *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005) ("Nominal damages are not given as an equivalent for the wrong, but rather merely in recognition of a[n] [] injury and by way of declaring the rights of the plaintiff. Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong.").

### 5. Attorneys' Fees

Macrophage seeks to recover its attorneys' fees as an element of damages. Delaware courts abide by the "American Rule" where "litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[184] One such exception is the "bad faith" exception under which attorneys' fees may be "awarded against a defendant where the action giving rise to the suit involve[s] bad faith, fraud, conduct that was totally unjustified, or the like and attorney's fees are considered an appropriate part of damages."[185] Contrary to Macrophage's suggestion, not every proven breach of the duty of loyalty will justify an award of attorneys' fees as damages.[186] The breach must be "egregious" or the product of "unusually deplorable behavior."[187]

---

[184] *Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228, 246 (Del. Ch. 2007); *see also Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998) ("[U]nder the 'American Rule' courts do not award attorneys' fees to a prevailing party absent some special circumstance.").

[185] *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *4 (Del. Ch. May 11, 2001).

[186] *VGS, Inc. v. Castiel*, 2001 WL 1154430, at *2 (Del. Ch. Sept. 25, 2001) ("[M]erely being adjudicated a wrongdoer under our corporate law is not enough to justify fee shifting."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 46 (Del. Ch. 2010) (requiring a showing of egregious conduct to justify an award of fees).

[187] *Dweck v. Nasser*, 959 A.2d 29, 46 (Del. Ch. 2008), *vacated on other grounds*, 966 A.2d 348 (Del. 2009) (noting that "an award of attorneys' fees is 'unusual relief' reserved for 'unusually deplorable behavior' limited to exigent circumstances"); *eBay*, 16 A.3d at 47 ("Fees may also be shifted to a losing party whose pre-litigation conduct was undertaken

Macrophage argues that Dr. Goldberg's decision to execute the Challenged Transactions, in violation of his fiduciary duties, was an "egregious breach of [his] duty of loyalty," made in "bad faith," such that the Court would be justified in awarding Macrophage's attorneys' fees as damages. I disagree. Dr. Goldberg's attempt to remedy the wrong he perceived when Navidea failed to engage with him to effectuate the August Agreement was misguided and ultimately unlawful.[188] It stands as a prime example of why contractual self-help rarely can be effected within the bounds of our law. If Macrophage had proven damages directly flowing from this conduct, Dr. Goldberg would be obliged to pay them. It did not. As noted, to take the leap from a proven breach of fiduciary duty to the recovery of attorneys' fees as damages, Macrophage was required to prove "glaring[ly] egregious[]" misconduct.[189] Instead, the evidence reveals Dr. Goldberg lost his patience with Navidea and then acted in frustration by causing Macrophage to deliver what he believed Navidea had promised him. He did not engage in the Challenged Transactions in a vacuum. He was wrong to take matters into his own hands and

in bad faith and was so egregious as to justify an award of attorneys' fees as an element of damages." (internal quotations omitted)).

[188] Tr. 413:15–20 (Goldberg).

[189] *Kaung v. Cole Nat'l Corp.*, 2004 WL 1921249, at *6 (Del. Ch. Aug. 27, 2004), *aff'd in part, rev'd in part sub nom.*, 884 A.2d 500 (Del. 2005) (shifting fees where plaintiff's conduct rose to the level of "glaring egregiousness").

Macrophage has prevailed upon the Court to unwind the Challenged Transactions and declare that they were the product of breaches of fiduciary duty. These remedies are proportionate to the wrongful conduct that has been proven.[190]

*eBay Domestic Holdings, Inc. v. Newmark* is instructive.[191] There, the court determined that two directors and controllers "breached their fiduciary duty of loyalty by using their power as directors and controlling stockholders to implement an interested transaction that was not entirely fair to eBay, the minority stockholder."[192] Yet, the court rejected the request to award attorneys' fees because the two controllers "subjectively believed the [disputed board actions], despite their uniqueness, were legally permissible under Delaware law."[193] Dr. Goldberg subjectively believed that he was effectuating a transaction that the parties had agreed to, and it appears Navidea's lawyer, Mr. Mower, at one time suggested a structure similar to the one Dr. Goldberg ultimately attempted to execute.[194] While

---

[190] *VGS*, 2001 WL 1154430, at *2.

[191] 16 A.3d 1.

[192] *eBay*, 16 A.3d at 46.

[193] *Id.* at 47.

[194] Tr. 413:15–20 (Goldberg) ("My intent was to replicate as closely as possible the August agreement with the exact same license as founded Macrophage, and it was to enable us to achieve, at least externally, the perception that there is a separation between therapeutics and Navidea."); *id.* at 623:21–624:12 (Goldberg) (noting that the idea for creating a subsidiary and sub-licensing out Macrophage's technology to that subsidiary was "suggested by Bill Mower post-August 14").

the conduct violated Delaware law, again, it was not so "egregious" or "deplorable" as to justify the extraordinary remedy of fee-shifting.[195]

## C. Conversion

Conversion is the "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it."[196] "Generally, the necessary elements for a conversion under Delaware law are that a plaintiff had a property interest in the converted goods; that the plaintiff had a right to possession of the goods; and that the plaintiff sustained damages."[197] "For a plaintiff to recover under a theory of conversion, he must prove, *inter alia*, precisely what property the

---

[195] I recognize, as Macrophage points out, that there are instances in which, rather than engaging in a traditional fee-shifting analysis, the court has awarded attorneys' fees, using its "broad discretion to tailor remedies," when damages are otherwise difficult to ascertain. *See Cantor Fitzgerald*, 2001 WL 536911, at *3. With that said, the court determined in *Cantor* that an award of attorneys' fees was appropriate because of the "egregious breach of [the] duty of loyalty" in that case. *Id.* There, the defendants knew they were breaching a partnership agreement and did so with the express purpose of challenging plaintiff's "core business." *Id.* In contrast, for the reasons already explained, I am satisfied Dr. Goldberg's conduct, while disloyal, did not constitute an "egregious breach of [his] duty of loyalty."

[196] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996).

[197] *Goodrich v. E.F. Hutton Gp., Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988); *Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *10 (Del. Ch. June 29, 2020) (same); *see also Rockwell*, 2004 WL 2965427, *4 ("The necessary elements of conversion are that Rockwell had a property interest in the confidential document; that Rockwell had a right to possession of the documents; and that Rockwell sustained damages.").

57

defendant converted and that his interest in the property was viable at the time of the conversion."[198]

Light on specifics, Macrophage's conversion claim rests on the contention that Dr. Goldberg converted Macrophage's "intellectual property."[199] Macrophage has elected to stop short of identifying the intellectual property and apparently would have the Court sift through the trial record to find it on its own. In this regard,

---

[198] *CIT Commc'ns Fin. Corp. v. Level 3 Commc'ns, LLC*, 2008 WL 2586694, at *2 (Del. Super. Ct. June 6, 2008); *see also Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *7 (Del. Ch. Jan. 13, 2014) (dismissing a conversion claim where the complaint only pled "broad categories of property" but did "not allege[] any specific property the Defendants [] converted").

[199] OB at 42 ("[S]ince at least November 2018, Dr. Goldberg repeatedly worked to convert Macrophage's intellectual property to himself."). Macrophage also argues, albeit in passing, that the Navidea Sub-License was converted in the Challenged Transactions and that certain documents and electronic devices were stolen upon Dr. Goldberg's termination. OB at 42. Macrophage concedes, however, that this Court's summary judgment ruling unwound the Challenged Transactions and directed the return of the Navidea Sub-License to Macrophage, and that the Court's contempt ruling directed the return of Macrophage's electronic devices. MTD and Contempt Op. at 80 ("The order requires that these devices be returned, that order has not been modified, and Dr. Goldberg doesn't get to decide for himself whether or not he will comply with that order."). Macrophage does not contend that the Navidea Sub-License was not returned in full form, but rather asserts that certain damages flowed from Dr. Goldberg's temporary possession or use of the sublicense. For reasons explained above, that claim has failed. As for the electronic devices, Macrophage has not asserted that Dr. Goldberg did not return those devices when the Court ordered him to do so and has likewise not claimed or proven any other damages resulting from Dr. Goldberg's alleged theft. Because no harm resulted from either the Challenged Transactions or Dr. Goldberg's possession of the devices, no conversion (in those respects) occurred. *Rockwell*, 2004 WL 2965427, *4 (holding that the element of damages is an essential component of a conversion claim). As for the allegedly converted documents, the trial record contains no reference to those documents so I have deemed that claim (Count VI) abandoned.

Macrophage has left some breadcrumbs. It first points to the minutes of the November 28, 2018 Macrophage Board meeting, which note that Dr. Goldberg "ha[d] sold his relevant IP to a partnership of his 4 children who have each individually assigned certain IP rights to the partnership as well."[200] Of course, the evidence is clear that the transactions discussed in those minutes never occurred.[201] The trail then runs cold.

Next, Macrophage points to a letter sent by Dr. Goldberg's personal counsel to Navidea on December 18, 2018, where counsel states that Dr. Goldberg is "the owner of certain intellectual property necessary for Macrophage to succeed."[202] Again, the trail runs cold as there is no evidence in the record that reveals what "intellectual property" counsel was referring to.

And finally, Macrophage points to another letter from Dr. Goldberg's counsel to Navidea, this time on January 18, 2019, where counsel states that if Dr. Goldberg's super voting stock was issued by Macrophage, Dr. Goldberg would then "deliver to Navidea and to Macrophage a document confirming that he asserts no ownership rights to any intellectual property directly [related to] . . . Navidea or

---

[200] JX 53.

[201] Tr. 441:15–23 (Goldberg); *id.* at 443:4–20 (Goldberg); *id.* at 501:7–14 (Goldberg).

[202] JX 62.

Macrophage products or processes."[203]  Again, there is no evidence that would lead the Court to an understanding of what intellectual property Dr. Goldberg owned or controlled related to "Navidea or Macrophage products or processes."[204]

I note that Dr. Goldberg confirmed that he currently does not own or possess any intellectual property related to either Navidea or Macrophage.[205]  For his part, Mr. Latkin testified that he had no idea whether Dr. Goldberg possessed any IP belonging to Macrophage or Navidea.[206]  And, Macrophage readily recognizes that Dr. Goldberg's "Proprietary Information Agreement" with Navidea meant any IP Dr. Goldberg created while at Navidea or any of its subsidiaries was and remains the property of Navidea and its subsidiaries.[207]

Based on the evidence presented, it appears that Macrophage would have the Court enter a judgment awarding damages based on a finding that Dr. Goldberg has

---

[203] JX 129.

[204] *Id.*; *see CIT Commc'ns*, 2008 WL 2586694, at *2 (holding that conversion claim failed for lack of evidence of "what property the defendant converted"); *Touch of Italy*, 2014 WL 108895, at *7 (holding that identifying "broad categories of property" allegedly converted is inadequate to sustain the *prima facie* burden to prove conversion).

[205] Tr. 583:7–12 (Goldberg).

[206] Tr. 268:5–20 (Latkin).

[207] JX 7.

converted unidentified property that he does not now, and may never have possessed. That is not a sustainable conversion claim under our law.[208]

### III. CONCLUSION

Macrophage has proven by a preponderance of the evidence that Dr. Goldberg breached his fiduciary duty of loyalty by entering into the Challenged Transactions (Count I).[209] With that said, Macrophage has failed to prove that any damages resulted from Dr. Goldberg's breach. Dr. Goldberg did not engage in egregious and bad faith conduct to justify awarding Macrophage's attorneys' fees. Thus, the Court will enter a judgment issuing Macrophage the declaratory judgments it seeks and awarding it nominal damages of $1.00. Macrophage has failed to prove its claims for conversion (Counts III and VI) and judgment will be entered in favor of Defendants on those claims.

Macrophage shall submit a form of final judgment implementing the Court's post-trial verdicts, on notice to Defendants, within ten (10) days.

---

[208] *Touch of Italy*, 2014 WL 108895, at *7.

[209] As noted above, the Court has elected not to adjudicate Macrophage's breach of the duty of care claim (Count II) given Macrophage's Section 102(b)(7) charter provision and the Court's verdict on the breach of the duty of loyalty claim. The claim of breach of fiduciary duty for Dr. Goldberg's failure to produce records relating to the Challenged Transactions (Count V) is rejected as moot since Macrophage has now received those documents in connection with this litigation. Finally, I note that the Court already has entered judgment in favor of Macrophage on its Section 271 claim (Count IV). *See* D.I. 86.